NEHEMIAH CARRINGTON, LIBELLANT AND APPELLANT, *v.* THE BRIG ANN C. PRATT, LEONARD B. PRATT, CLAIMANT.

Where a bottomry bond was taken for a larger amount than was actually advanced, with a fraudulent purpose, to enable the owner of the vessel to recover the amount of the bond from the underwriters, the bond was void.

Not only so, but the lender of the money loses his maritime lien upon the vessel for the sum actually advanced.

THIS was an appeal in admiralty from the circuit court of the United States for the district of Maine.

The case is stated in the opinion of the court.

It was argued by *Mr. Rowe,* for the appellant, and *Mr. Fessenden,* for the appellee.

· *Mr. Rowe* made the following points, namely :—

1. Airey was rightfully in possession and command of the brig at St. Thomas, and had power to hypothecate her.

2. Airey's conduct, if wrong in this respect, cannot affect the libellant's claim. 3 Sumn. 228.

3. The attempt at deception was not for the purpose of wronging or injuring any party.

4. It does not appear that Carrington was *particeps criminis.*

5. The bond is not void *in toto,* but valid to the extent of the actual advances and interest. 1 Dodson, 389; 8 Pet. 228; 1 Wheat. 107.

6. The fraud, even if Carrington be *particeps criminis*, was not such as to render the bond void *in toto*. 3 C. Robinson, 240, 276.

7. If the bond is invalid *in toto* now, it was void *ab initio*, not voidable merely; and the rights of the parties are the same as if the instrument had not been drafted. 3 Camp. 119; Abbott on Shipping, Pt. II. 142, 151; 11 Mass. 359; 1 Pick. 415.

8. The libellant had a lien upon the brig for his advances, at the date of the bond. 8 Pet. 538, 550; The Hunter, Ware's Rep. 249.

9. The lien has never been extinguished or waived. 7 Pet. 324, 345; 4 Wheat. 255, 290, 291.

10. The lien was not lost by the subsequent fraud.

*Mr. Fessenden* made the following points :—

1. This was peculiarly a contract of bottomry, having all its characteristics and incidents. Kent's Comm. (7th ed.) 3, 429, 430; 3 Sumn. 228; 4 Law & Eq. Rep. 589.

The draft and agreement do not affect its character. Kent, 3, 423, 424; The Hunter, Ware's R. 249; The Nelson, 1 Hag. 169.

2. Being perfected, and in due form, it forms an express lien upon the vessel. Bottomry is a lien of the strictest kind, only seamen's wages having precedence of it. The Dowthorpe, 2 W. Rob. 73; 9 Eng. Ad. Rep. 79.

Having stipulated for and obtained an express lien of the highest character, as by bottomry, the material man, or lender, necessarily loses, or waives, the implied or tacit hypothecation, which he might otherwise have had.

Because the two liens are inconsistent, being of a different nature. One may coexist with a claim upon the owner; the other cannot. A bottomry bond binding the owner is held void as to that part, in order to sustain the express lien. The common law maxim applies, *Expressum facit cessare tacitum.* The Nestor, 1 Sumn. 1, 78, 83, 86; Abbott on Ship. from Molloy, 198; The Nelson, before cited; The Tartar, 1 Hag.

Maritime, like common-law liens, are lost by acts inconsistent with the lien—taking other securities and the like. Ramsay v. Allegre, 12 Wheat. 611; The William Money, 2 Hag. 136; The Betsey and Rhoda, Davies, 112; Paul v. Hayford, 22 Maine, 234; Story on Bailments, § 360; Swett v. Brown, 5 Mass. 180; Buck v. Ingersoll, 11 Met. 226; Libby v. Cushman, 29 Maine, 432.

3. The libellant having selected his security, must rely upon that alone, so far as the lien is concerned. And this security is lost by its fraudulent character. The Tartar, 1 Hag. 14; The

Nelson, 1 Hag. 176; The Sydney Cove, 2 Dods. 1; Bouvier, Law Dic. Tit. Fraud; Willis v. Baldwin, Doug. 450; Smith v. Bromley, Doug. 696; Alsager v. Spalding, 4 Bing. N. C. 407; Smith v. Hubbs, 10 Maine, 70; The Ann C. Pratt, Curtis, 345; Lowry v. Pierson, 2 Bailey, 324.

A court of equity will not aid a party to enforce such a contract, or to escape from the consequences. Story's Eq. 1, § 59; Cases cited in note to same, 2, § 697.

This is equally true in the admiralty. Courts of admiralty act as courts of equity. Brown v. Lull, 2 Sumn. 449; The Betsey and Rhoda, Daveis, 119.

The fraud attempted in this case, if intended for the underwriters only, was upon a party directly interested, and for whom the master was agent, in the state of facts then existing. Bryant v. Com. Ins. Co. 6 Pick. 131; Douglass v. Moody, 9 Mass. 548.

4. The contract, being void for fraud, cannot be sustained for any part. The cases where a bottomry bond has been sustained for a part, go no further than to reject such portion as is inconsistent with the contract of bottomry, in order to give effect to the express contract. They do not reject the contract, and give another remedy. The Hunter, Ware, 249, stands alone, opposed to legal principles, and that was not a case of fraud. The libellant cannot, therefore, resort to the lien he might have had but for the bond. The Ann C. Pratt, and cases cited, Curtis, 352.

The libellant could only claim under a tacit hypothecation by alleging his own turpitude in the matter of the bond. This the law never permits.

Mr. Justice NELSON delivered the opinion of the court.

This is an appeal in admiralty from a decree of the circuit court of the United States for the district of Maine.

The original libel, filed by Carrington in the district court against the brig, was founded upon a bottomry bond executed by Airey, the mate and acting master, at the island of St. Thomas, by which the vessel was hypothecated to the libellant for the payment of the sum of $4,591.42, advanced by him for her necessary repairs and supplies, she having arrived at that port in a disabled condition, together with ten per cent. maritime interest, the whole sum amounting to $5,050.56.

The defence set up to the libel, so far as it is material to be noticed, was that the bond had been executed for a much larger sum than was loaned, and was received by the lender knowing the same, and in fraud of the rights of the parties interested.

Upon the coming of the proofs, it appeared that the sum really advanced to the acting master was but $3,877.25, it

being $714.17 less than the amount for which' the bond was given.

The proofs' further showed that two sets of accounts and vouchers were made out by the clerk· of the libellant; the one corresponding with the truth of the case, the other with the fictitious amount of the bottomry bond; both of which sets were forwarded to the, father of the captain of the brig, with letters of advice, both from the lender and Airey, the mate, informing him that the bond was given for the larger sum, and the false accounts and vouchers sent, to enable the owner to make a claim for the same against the underwriters upon the vessel. Captain Pratt, the master of the brig, was on shore with the ship's papers, at St. Michael, when the storm occurred that disabled the vessel, and became separated from her, when Airey, the mate, took the command and proceeded to St. Thomas. By an arrangement between Airey and the libellant, it was agreed that the former should draw a bill in favor of the latter, upon the father of Captain Pratt, for the actual sum advanced, and, if paid at maturity, (thirty days' sight,) the maritime interest of ten per cent. would be relinquished. This accounts for the communication of the parties with the father on the subject, instead· of with Captain Pratt himself.

The district court, after allowing an amendment of the ·libel at the, sitting, setting up a claim upon the vessel for the true sum advanced, with the maritime interest, held that a lien existed upon the brig, in favor. of the libellant, for this amount,.by operation of the general admiralty law, and decreed accordingly.

The claimant appealed· to the circuit court; that court reversed· the· decree below, and dismissed the libel, concurring with the district judge that the bottomry bond was fraudulent and void, and could not be admitted as the foundation of a decree ·in favor of the libellant, for any amount; but differed with him upon the other question in the case, and held that the contract between Airey and the lender, for security by bottomry, and fulfilment of that agreement by the execution of the bond, were acts wholly inconsistent with the idea of· a general or implied maritime lien on the vessel, and that none therefore existed.

Upon full consideration, we all agree that the decree of the circuit court is right,.and should be· affirmed.

As it respects the right to a recovery upon a bottomry bond, the libellant is met by the·defence resting upon the familiar principle that a court administering justice upon principles of equity will not lend its aid to enforce the fulfilment of a contract in favor of a party to it, which is founded in fraud. 2 Story's Eq. § 298, and cases. In such cases, the court leaves both parties where the law finds them, giving no relief or countenance to

claims of this description. Here, the underwriters, who were sought to be defrauded by the use of the fictitious accounts and vouchers, were directly interested in the transaction, as the fair expenses of the repairs of the brig fell within one of the perils insured against. Any contrivance, therefore, to exaggerate them, or by which evidence could be furnished to enable the owner to recover on his policy a greater amount than actually advanced, was dishonest and fraudulent, and can receive no countenance in a court of justice.

It is insisted, however, that the security should be held valid for the amount actually advanced, conceding it to be void for the excess. It is true, that a bottomry bond may be good in part and bad in part, and may be upheld even in cases when taken for a sum in the aggregate larger than that which properly constitutes a lien upon the vessel within this species of security. There are many cases to this effect. Abbot, 126, n.; 1 Wheat. 107; 8 Pet. 228. These are cases, however, in which the items rejected were not properly chargeable on the ship, or were embraced within the bond from inadvertence or mistake, and entirely consistent with the good faith of the parties in the transaction. They stand upon widely different principles from those where the objectionable items are fictitious, and inserted in the bond with the intent to defraud third persons. The entire security in such cases becomes tainted with the fraud, and a *particeps criminis* is not allowed to come into court to enforce it, even for the money advanced or expended; for to permit it would afford countenance to the fraud by giving partial effect to it.

By holding the security valid to the extent of the loan, rejecting the excess, the guilty party would risk nothing; for, when detected in the fraud, he would still be enabled to reimburse himself for the amount really due. We have seen that the rule of equity—and which is the rule of admiralty in such cases—refuses to interfere for relief, and leaves the parties where the law finds them.

Assuming, then, the bond to be void, as an hypothecation for the money advanced, and, therefore, not available to charge the vessel, can the lender resort to the general or implied maritime lien that it is claimed attaches in cases of repairs or advances in the foreign port, in the absence of any special agreement to the contrary?

We think not. The contract of hypothecation, by bottomry, under which the money was loaned, is different from that implied by the general admiralty law. In the one case, the money advanced is payable only in the event of the safe arrival of the vessel at the port of destination, the lender taking the responsibility of the sea-risk, and entitled to charge extraordinary inter-

est. According to the terms of the bond in this case, Carrington and Company, the lenders, " agreed to stand to and bear the hazard and adventure thereof, on the hull or body of the said brig, during her voyage;" and the condition is, " to pay or cause to be paid at the expiration of five days after first arrival of said brig," &c.; but, " if, during the said voyage, an utter loss of said brig, by fire, enemies, or other casualty, shall unavoidably happen, &c., then this obligation to be void;" and in the case of hypothecation the owner is not personally liable for the advance or repairs. In the other—the case of an implied lien—the obligation to pay the money is absolute; and to secure the payment, the vessel, the credit of the owner and of the master himself, are pledged.

Now, it is well settled that the lien implied by the general admiralty law, may be waived by the express contract of the parties, or by necessary implication; and the implication arises in all cases where the express contract is inconsistent with an intention to rely upon the lien. A familiar instance is where the money is advanced or repairs made, looking solely to the personal responsibility of the owner or master. Abbot, 125, n.; ibid., 116, n., Story's Ed. 1829. In that case, no credit being given to the vessel as a security, the implied lien is necessarily displaced.

It is true, in this case credit was given to the vessel by the lenders, and a lien thus provided for; but it was one altogether different from that implied by the admiralty law, and inconsistent with an intention to look to that as a security for the loan, as much so as if he had agreed to look solely to the personal responsibility of the owners.

It is insisted, however, assuming the bond to be void and inoperative, that the lender is then remitted to his implied lien, the same as if no bond had been given. How this might be in a case where the instrument was defective and void, for want of authority to execute it, or for any other cause consistent with the good faith of the parties, it is not now necessary to inquire, or express any opinion. But we think it clear that no such principle can be admitted in a case where the bond has been avoided on the ground that it was entered into in bad faith, and with intent to defraud, on the part of the lenders. Any other conclusion would be giving to a party the benefit of his own turpitude, which the law forbids.

The admiralty law treats this species of security with a good deal of indulgence, and properly so, as the advances to the master at the foreign port by the merchant is oftentimes essential, to enable the vessel to earn her freight, and is for the general interest of commerce. The advance is made also frequently at great

risk, on the part of the lender, he being a stranger to the owner and master, and must look, from necessity, mainly to the pledge of the vessel for his security. The court, therefore, leans in favor of upholding these hypothecations, disregarding technical objections and nice distinctions, which sometimes invalidate instruments at common law; but, they are the creatures of necessity and distress, and are entered into in the absence of the owner, who has no opportunity to guard his interests; and the transactions, therefore, out of which they arise should be strictly watched, and the observance of the utmost good faith exacted from all the parties' concerned.

It has been recently held, in the court of exchequer in England, that the master can pledge the ship for repairs, or loan of money for that purpose, in the foreign port, only by bottomry security; and that, in the absence of this, the merchant must look to the personal responsibility of the owner or master. 73 Eng. Com. Law R. 417; Stainbank and Ambler *v.* Shepherd.

As this question does not necessarily arise in this case, it is not important to inquire as to the rule of the admiralty in this country in this respect.

Judgment of the court below affirmed.