## THE ARCHER.

*(District Court, S. D. New York. January 30, 1883.)*

1. BOTTOMRY BOND—MORTGAGEE—MALA FIDES—ESTOPPEL.

   A bottomry bond executed in a foreign port for repairs to a vessel putting back in distress, by the master, who is also the sole legal owner, cannot be declared void for mere want of authority to execute it as against a mortgagee not in possession, whatever his equities. Where such mortgagee, however, has claims exceeding the value of the vessel, and the lenders on bottomry know that fact, or are chargeable with knowledge of it, one of them being the agent of the ship, and arrangements having been first made with them by which the mortgagee should accept drafts for the repairs, and near the close of the repairs a bottomry bond is demanded, without further communication or notice to the mortgagee, and the master thereupon executed the bond, with a premium of 20 per cent., under a promise of some compensation to himself, which was afterwards paid: *held*, that the bottomry was unnecessary and in bad faith upon the part of the master and lenders, as respects the mortgagee, and that the premium of 20 per cent. included in the bond should be wholly disallowed.

2. SAME—PAYMENT FOR REPAIRS.

   The bills for repairs having been paid by the lenders in bottomry in good faith, upon the master's certificate, *held*, that it was too late to consider whether the prices charged were excessive.

In Admiralty.

*Theodore F. H. Meyer*, for libelants.

*William W. Goodrich*, for claimant.

*Butler, Stillman & Hubbard*, for claimants of cargo.

BROWN, J. This libel was filed to recover the amount due upon a bottomry bond, executed by Capt. Crossman, upon the American ship Archer, to one Addicks, at Bremerhaven, on the thirty-first day of December, 1877, for the sum of 21,371 marks, payable five days after the arrival of the vessel in New York, with 20 per cent. premium, amounting in all to 25,645.30 marks. The Archer, having previously sailed from Bremerhaven, had put back in distress and leaking, and arrived there in the early part of November, 1877. The mercantile house of Roters & Co. had previously done some business for the ship when in that port, and paid her disbursements upon the captain's drafts on New York for comparatively small amounts. Previously to the arrival of the vessel, the principal member of the firm of Roters & Co. had died, and the business was then being managed by Mr. Meiners. Capt. Crossman testifies that he saw Meiners and made an agreement with him that Roters & Co. would pay for the necessary repairs of the vessel upon drafts on New York. Mr. Meiners denies that there was such an agreement. Several surveys

of the vessel were afterwards made, and extensive repairs were recommended, which were completed during the months of November and December, 1877. The vessel sailed for New York on the tenth of January, 1878, where she arrived about 60 days afterwards. During the pendency of this action the vessel has been sold by the marshal for $6,700, a sum in excess of the libelant's claim, so that the cargo, which was also attached, is exempted. Payment of the bond is resisted by Mr. Harrison, as owner of the vessel, on the ground that the repairs were excessive in amount, i. e., beyond the necessities of the ship; *second*, that the prices charged for many of the items were extortionate; *third*, that a part at least was paid before the bottomry bond was asked for; *fourth*, that all the repairs were agreed to be paid for in drafts on New York, and that the bond was obtained fraudulently and without necessity; *fifth*, that Mr. Harrison was the owner and in good credit, and the bond was executed without authority.

The question of the ownership of the vessel is of importance in this case. The bond includes about 1,057 marks, as near as I can make out, which was advanced before bottomry was spoken of or contemplated. This could not be included in a subsequent bond for the benefit of the ship's agent as against an absent owner. *The Augusta*, 1 Dod. 283; *The Hero*, 2 Dod. 143. Moreover, communication with the owner before executing a bottomry bond is necessary, where such communication is practicable, in order that the owner may by procuring funds avoid the extraordinary premium which bottomry entails. *The Hamburg*, Brown. & L. 253; *The Lizzie*, L. R. 2 Adm. 254; *The Oriental*, 7 Moore, P. C. 398; *The Onward*, L. R. 4 Adm. 38. Communication by mail and telegraph from Bremerhaven with Mr. Harrison in New York was easy, and there is no claim that he ever authorized bottomry; but on the contrary, in answer to Capt. Crossman's communication, he directed drafts on him at 60 days, and this I find was communicated to Mr. Meiners about November 25th, to which no objection was made.

There is a conflict in the testimony between Capt. Crossman and Mr. Meiners, the former alleging that Mr. Meiners agreed at first to pay for these repairs on the credit of such drafts. There are several circumstances which confirm in part Capt. Crossman's statement, on this subject, and show that such was the expectation at the time the repairs were commenced. Mr. Meiners himself testifies, "the bills were paid by my direction; Capt. Crossman had promised me that remittances would be made from New York to cover his expenses."

At the time, however, when the first conversation, testified to by Capt. Crossman, with Meiners occurred, the surveys had not been completed, and it would seem that no such extensive repairs as were afterwards made were then contemplated; and the distinct defense is here set up, which is supported by some evidence, that much of the repairs, though useful to the ship, and in a sense necessary, was not necessary to enable her to complete her voyage; the principal item being the entire new coppering of the vessel, instead of partial recoppering, where recaulking had become necessary. The probable truth appears to be that Capt. Crossman, understanding that Roters & Co. would advance on New York drafts the moneys necessary to pay for the repairs, thought it best to repair the ship thoroughly, in accordance with all the recommendations of the surveys. From the testimony of Mr. Meiners, I think it is evident that these were much more than was anticipated when the vessel arrived and when repairs were first talked of, but that he must have known their general character and probable amount when Harrison's cable to draw on him was exhibited, and that only until some three weeks afterwards did he demand security by bottomry, to-wit, about the seventeenth or eighteenth of December.

The bond was executed on the 31st, and, so far as appears, no communication was had or attempted with Mr. Harrison between these dates, and no notice given him of the demand of bottomry, or opportunity of furnishing funds to avoid it, as might easily have been done. Upon the authorities above cited, such notice and opportunity, under the circumstances of this case, should be regarded as essential conditions of the master's authority to execute a bottomry bond, if Harrison was entitled to be considered as the legal owner, and Crossman as having no authority other than that of captain.

From the evidence before me, however, Mr. Harrison cannot be considered as the legal owner. By the register, Capt. Crossman appears as sole owner; he is so described in the ship's papers, and these were exhibited to Meiners and to Addicks, the lenders on bottomry. Mr. Harrison was holder by assignment of a chattel mortgage for $3,000 upon three-fourths of the vessel, which was in default, and was also the holder of another mortgage, to secure $7,000, upon the whole vessel, which was not in default. So far as appears, this was his only interest in the vessel. Capt. Crossman states that he received the amounts of both of these mortgages, and that nothing had been paid upon them. He states, it is true, that Mr. Harrison was virtually the owner of the vessel from the time he had

bought her; but no explanation of this statement is given other than the statement of his claims as mortgagee, which, it would seem, equaled or exceeded the value of the vessel. This, however, did not make him legal owner, nor does it appear that he ever took possession of the vessel until after her return to New York in 1878.

Capt. Crossman, at the time of the execution of the bottomry bond, was the legal owner, and where that is the fact, a bottomry bond executed like this, by the sole legal owner, cannot be held void for mere want of authority to execute it, on account of any equities, however great, of a mortgagee not in possession. As this bond was, therefore, executed by Capt. Crossman, the legal owner, and as all the bills for which it was given were incurred by his direction and under his supervision, and the amounts approved by him, the bond must be sustained as respects all the amounts paid on account of the ship before as well as after the agreement for the bottomry bond. *The Panama*, Olcott, 343, 348, and cases cited.

The charges of fraud are not sustained by any proof, so far as respects the amounts alleged to have been paid by Roters & Co. and Addicks. They had no interest in these bills. They paid the full amount of them, and upon the approval of Capt. Crossman. As respects these payments the case is, therefore, wholly unlike that of *Carrington* v. *Pratt*, 18 How. 63, to which my attention has been called, where the charge of fraud was sustained by proof that false vouchers for increased amounts beyond those actually paid on account of the ship had been presented and included in the bond. If the bills in the present case were excessive, it was the duty of Capt. Crossman to correct them at the time. There is no evidence that Roters & Co. or Addicks had any knowledge that they were so; and after payment, upon the approval of the captain, it is too late to question their correctness as against the lenders on bottomry. *The Yuba*, 4 Blatchf. 352.

The premium of 20 per cent. included in the bottomry bond must, upon the evidence, as I am constrained to interpret it, be wholly disallowed, as against Harrison, the claimant in this suit, on the ground that the resort to bottomry was unnecessary, in fact; that the lenders knew it, or were chargeable with knowledge of it; and that it was taken in bad faith, as respects Harrison, both on the part of the lenders and of the captain.

It is clear from the testimony that Crossman, though the legal owner of the vessel, had no pecuniary interest in her of any value. The claims of Harrison, as mortgagee, exceeded her full value, and

he was virtual though not legal owner. On putting back to Bremer-haven, Capt. Crossman had written by mail to Harrison, and in the latter part of November received a cable dispatch, in reply, to draw upon him at 60 days for the repairs. He showed this dispatch, as he testifies, at once to Mr. Meiners, who, as Crossman says, after a few days, replied that that was satisfactory. Mr. Meiners, in his deposition taken nearly five years afterwards, merely says he does not remember such a dispatch; but, as I have said above, he testified that the bills were paid after Capt. Crossman "had promised that remittances would be made from New York to cover his expenses." At that time surveys had been made, and the repairs were already well under way, and the amount of them must have been approximately known. When the repairs were nearly completed, about the seven-teenth or eighteenth of December, he told Crossman that a bottomry bond must be given, mentioning 15 per cent. as the probable pre-mium. Capt. Crossman at first expostulated against it, but subse-quently acquiesced, without further communication or notice to Har-rison. After a short advertisement for offers on bottomry, to which there were no answers, Meiners referred Crossman to Addicks, who had been formerly connected with Roters & Co., and whom Meiners had previously spoken with in reference to it, and bottomry at 20 per cent. premium was then agreed upon between Addicks and Crossman.

Crossman testifies that in this interview with Addicks the latter offered to make the premium 25 or 30 per cent. and return Crossman the difference, upon which Crossman asked "how that would benefit him, as he was owner;" to which Addicks replied, in effect, that though Crossman appeared as owner on the papers, he supposed he was only nominally so. The latter part of this conversation, Addicks, in his subsequent deposition, does not deny, but he does deny that he said anything about charging 25 or 30 per cent. premium and returning the difference. At the close of the interview, however, Crossman tes-tifies that he asked Addicks to give him back 5 per cent., "now that he had got a bond to suit him," and that he promised to do so. Addicks denies such a promise, but he says, "Crossman said, 'I suppose now you will give me some of this money back, as I am a poor man;' and in order to have no further talk about the matter I said, 'We will see about it;'" but that he "never gave him any percentage money back." Crossman, not intending to return with the vessel, had, dur-ing the repairs, appointed Thurman as captain, who executed the bond as well as Crossman. On the twelfth of January, two days after the vessel had sailed, Meiners, as Crossman testifies, gave him

400 marks as sent to him by Addicks. Meiners denies that he paid him 400 marks "as coming from Addicks." Mr Addicks denies that he ever sent him 400 marks. The force of these qualified denials is much impaired by the fact that it first became known in September, 1882, when their testimony was given, that the bond, though in the name of Addicks only, was taken upon a secret agreement with Meiners that the latter, on account of Roters & Co., as he says, should advance half the money and have a half interest in the bond. The acts and knowledge of each, therefore, bind the other. Capt. Crossman, on the trial, also testified that in a conversation with Addicks he told him that Harrison was the virtual owner.

The inferences to be drawn from this testimony do not rest upon Capt. Crossman's uncorroborated statements, but are sustained by the admissions, and the meager and qualified denials of both Addicks and Meiners.

No such conversation as Addicks admits in regard to the return of a part of the premium to Capt. Crossman is in the slightest degree probable, except upon the assumption that Addicks knew that Crossman was not the beneficial owner, and it confirms Crossman's statement that he told Addicks that Harrison was virtual owner.

The charge by Meiners of 69 marks for telegrams and postage is not explained. No occasion for telegrams is made known, except to ascertain the responsibility of Harrison; and three or four days after seeing the dispatch from him he told Crossman it was satisfactory. It is not improbable that telegrams had been used for inquiry, as might easily have been done. It is not claimed that any doubt existed as to Harrison's responsibility, or that any notice of objection thereto was given to Crossman, otherwise than as might be implied from the mere fact of demanding a bottomry bond at the last moment. This implication is rebutted by the testimony of Meiners that he offered to take drafts for about one-third of the amount, if two other material-men, whose bills covered the residue, would take similar drafts; that is, if this alleged offer was itself made seriously, which there is some reason to doubt, since it was scarcely to be supposed that material-men, wholly strangers to the ship, would accept payment in that way.

Good faith to Mr. Harrison, who, I cannot doubt, was known to Meiners and Addicks, at the time of the negotiation for the bond, to be in the position of beneficial owner, though not the legal owner, required notice to Harrison of any change in the previous understand-

ing in regard to the payment of the repairs by means of drafts on him, and opportunity to him to provide funds for payment there, if that were insisted on. *The Onward*, L. R. 4 Adm. 38; *The Hero*, 2 Dod. 143; *The Staffordshire*, L. R. 4 P. C. 194; Roscoe, Adm. (2d Ed.) 88. Such notice and opportunity could easily have been given by telegraph at slight expense. But this was not done. That a bottomry bond should be executed at the last moment, and to the agent of the ship, at a high premium, coupled with the subsequent gift of 400 marks to Capt. Crossman, the legal, though not the beneficial, owner, is evidence to my mind that both were willing to take advantage of the situation for their own benefit; Capt. Crossman at first opposing, but afterwards acquiescing, in the unnecessary burden of this premium upon the vessel, to the injury of Mr. Harrison or any one else who might be interested in her.

As against Harrison, therefore, it is inequitable that this premium should be enforced; the lenders knew it, and it should, therefore, be wholly disallowed. The bills making up the principal are all equitable claims as respects the lenders; the bond should stand, therefore, for that amount and interest. *The Packet*, 3 Mason, 255, 260; 1 Pars. Shipp. & Adm. 163. If Crossman had any beneficial interest in the vessel, the premium might be enforced to the extent of his interest; but as he claims none, and manifestly has none as against the claimant, judgment should be entered for the amount of the principal only with interest and costs.

The owners of the cargo are entitled to a dismissal of the libel as to them, with costs.

---

## THE L. B. SNOW.

*(District Court, D. Massachusetts.   February 13, 1883.)*

1. SEAMEN'S WAGES—LIBEL.

    A libel for seamen's wages will not necessarily be dismissed for the reason that the action was prematurely brought, if substantial justice can be done under it.

2. SAME—ENFORCEMENT OF CONTRACT.

    A written contract which appears to be a reasonable one, and, if enforced, will do no injustice to either party, will be so enforced by a court of admiralty, even though it appear that the meaning of the contract may not have been clearly understood by the parties.