## THE MAUNA LOA.

### GRACE et al. v. THE MAUNA LOA.

#### (District Court, S. D. New York. July 1, 1896.)

BOTTOMRY AND RESPONDENTIA BOND INVALID, AS UNNECESSARY AND WITHOUT COMMUNICATION—PORT OF REFUGE—REPAIR OF SHIP—SEAWORTHINESS UPHELD—BUREAU VERITAS CERTIFICATE—GENERAL AVERAGE.

The bark Mauna Loa, with a cargo of nitrates shipped at Chili for New York, sprung a leak after proceeding about 1,500 miles on her voyage and put into Valparaiso for repairs, where she had to unload her cargo, involving some loss; by arrangement between the libellants and the ship owners at New York, the latter remitted a cable credit for the estimated expenses of repairing the ship, as well as for the ship's estimated share of general average charges, on the understanding that the libellants would advance their share of the general average chargeable against the cargo. The libellants' agents at Valpariso were also agents of the ship at that place. The libellants instructed the agents to take a respondentia bond for the cargo's share of the general average. The agents took from the master a bottomry and respondentia bond, considering that the ship owners had not advanced their whole share. The bond was taken without notice to the shipowners, who were in good credit and prepared to furnish on notice by telegraph any further money that might be needed. The agents themselves, after advertisement, took the bottomry and respondentia bond from the master, and afterwards assigned it to the libellants. The bond embraced about $3,000 for premiums and various charges beyond the actual advances. Held: (1) That the bottomry bond was invalid, as an express contract, for want of communication with the owners; also as being taken without necessity and contrary to the libellants' instructions; but that the ship was answerable for any deficiency in the sum paid for her share of the general average charges; (2) that upon the conflicting testimony as to the seaworthiness of the ship at the time she sailed, the fact that her certificate issued by the Bureau Veritas had just expired was not conclusive; and that upon all the circumstances, including

the contemporaneous judgment at Valparaiso, the seaworthiness of the vessel should be sustained; and that the cost of putting in to Valparaiso and of unloading the cargo were, therefore, valid charges in general average.

Macfarland & Parkin, for libellants.
Wing, Shoudy & Putnam, for claimants.

BROWN, District Judge.   The above libel was filed by William R. Grace & Co., of New York, the charterers of the British bark Mauna Loa, and owners of a cargo of nitrates shipped at Caleta Buena, to recover for a certain loss of nitrates in unloading and reloading at Valparaiso, a port of refuge, and also to recover, as assignees of a bottomry and respondentia bond for £2422.6.2, executed by the master to Grace & Co., of Valparaiso, in 1893, under the following circumstances:

The cargo being loaded pursuant to charter at Caleta Buena, the ship, on July 26, 1893, sailed for New York.   On the 13th of August, when about 600 miles to the southwest of Valparaiso, the ship was found to be leaking so badly that after consultation between the master, officers and crew, she put back to Valparaiso for repairs, and reached that port on August 24th.   The unshipping and reloading of cargo was attended by some loss of nitrates, and this loss is one of the subjects of claim in the libel.   For the repairs to the hull, the owners after repeated consultation with the libellants in New York made remittances to the master amounting to £1,600, as the estimated cost of repair, and £200 for the ship's estimated share of the general average expenses at the port of refuge; the libellants, after consultation between them and the respondents, being expected to supply the residue of the general average expenses as the cargo's proper share.   The libellants at New York instructed Grace & Co., their representatives in Valparaiso, to provide this balance by loan on respondentia bond, i. e. on the cargo only.   But Grace & Co. procured the master to advertise for a loan on bottomry and respondentia, and they themselves, made the loan on this double security.   The master had never executed a bottomry bond before.   Grace & Co. were the ship's agents at Valparaiso, as well as the libellant's agents, and they represented to the master that it was the proper course for the master to raise the rest of the money by bottomry and respondentia.   This bond was afterwards assigned to the libellants at New York, who held it at the time of the ship's arrival; and this is the second subject of the libellant's demand.   After delivery of part of the cargo, the master, learning that the libellants claimed to offset the amount of the bottomry bond against the unpaid freight, refused to deliver the rest of the cargo, until security was furnished for the balance of the freight.   The above libel was thereupon filed.   A deposit was afterwards made in the registry of the court to cover the claim for freight, and the cargo was delivered.

The defendants aver that the bond, so far as it affects the vessel by bottomry, was unnecessary, unauthorized, and void, and

contrary to the master's instructions; that the bark was staunch and seaworthy at the commencement of the voyage, but was obliged to put back to Valparaiso through sea perils; that the expenses there, except repairs, were a general average charge; that upon conference with the libellants, the claimants put the master in funds for all general and particular average chargeable against the ship; and that since arrival here, a general average adjustment had been made by which less than $800 is found due to the cargo account, and that the balance of freight money due from the cargo to the vessel is $5,004.26.

The libellants contend that no part of the port of refuge expenses are a general average charge, for the reason that, as the libellants claim, the ship sprung a leak in consequence of her insufficiency and unseaworthiness at the time of starting on her voyage from Caleta Buena, through lack of proper caulking and metalling; that the port of refuge expenses arose through the fault of the ship, and must, therefore, be borne by her alone.

The correspondence and telegrams between Grace & Co. of Valparaiso, the libellants in New York, and the agent of the claimants here, leaves no doubt that at the time the repairs were made the expenses at Valparaiso, aside from repairs to the ship, were understood to be a general average charge; that the claimants transmitted to Valparaiso all their estimated share, and understood that the libellants would supply their share, and that the libellants intended to do so by means of a respondentia bond upon their cargo, and so directed. This sufficiently appears from the following brief summary, supported by the oral testimony.

On the 4th of November, 1893, the libellants cabled from New York to Grace & Co. at Valparaiso, between which ports there was daily cable communication, asking what the expenses would be "exclusive of repairs (i. e. to the ship), and inclusive of re-shipment" (i. e. of cargo); and at the same time they transmitted a message from the owner to the captain to proceed with the repairs. On the 6th of November, the owners mailed to Captain Douglass a letter of credit for £1,800 to cover repairs to the ship, and £200 for the ship's estimated share of general average. On the 8th of November the libellants received from Grace & Co. a cable that "expenses would be about £1,600; and added, "May we take captain's drafts for disbursements, including cost of repairs." On November 9, the libellants replied: "Mauna Loa owners will mail to-day on Baring Bros. & Co., London, £1,800. Will let you know later about advancing balance." On the 23d the libellants directed Grace &. Co. to advertise for Mauna Loa balance against respondentia bond, and in their letter of November 29 to Grace & Co. they referred to the cable last named, and to advance "if you thought well of it against respondentia bonds any balance which the vessel might need for transshipment needs and disbursements." This was evidently in conformity with the arrangement testified to by the respondents, that the libellants would provide for the estimated expenses chargeable in general average against the cargo.

On December 15th Grace & Co. at Valparaiso advertised for a

loan on bottomry and respondentia, and on January 4, 1894, explained to the libellants that their deviation in making the advance upon bottomry as well as respondentia was "owing to the fact that the £1,800 supplied by the owner did not, in our estimation, cover the ship's liability to general average"; which I understand to mean that they considered the £1,800 already supplied by the owners to the master to be somewhat less than would be chargeable against the ship, because her share of general average was thought to have been estimated too low.

The evidence leaves no doubt that the owners of the bark were at that time in good credit, and had no difficulty in supplying such funds as were needed, without incurring the extra charges incident to bottomry. In this bond a charge was made for maritime premiums at the rate of 15%, with other incidental expenses, amounting in all to about $3,000, above the actual advances.

Upon the circumstances proved in this case, the bottomry bond cannot be upheld as an express contract, nor any lien recognized for the extra expenses attending it. There was no need of resorting to a bottomry bond, or of these extraordinary expenses. The bond was taken without notice thereof to the owners, or communication with them on the subject, although means of daily communication with them existed; it was taken without their knowledge, contrary to their intent, and without necessity; since they were able to supply all the funds required, as both the master and Grace & Co. had sufficient reason to know. On this ground alone it would be invalid. 1 Pars. Shipp. & Adm. 143; Wallace v. Fielden, 7 Moore, P. C. 398; The Circassian, 3 Ben. 398, 417, Fed. Cas. No. 2,724; The Archer, 15 Fed. 276; Id., 23 Fed. 350; The Giulio, 27 Fed. 318. It was also taken contrary to the directions of the libellants, as cargo owners. Grace & Co., moreover, as the agents of the ship in Valparaiso, held confidential relations with the master and owners, and were bound to protect them against such extra charges by proper advice and communication, instead of taking advantage of the master's ignorance, to their own profit. "The utmost good faith is exacted of all parties concerned." Per Nelson, J., Carrington v. Pratt, 18 How. 63, 69. And see The Julia Blake, 107 U. S. 418, 432, 2 Sup. Ct. 692, 703, affirming Id., 16 Blatchf. 472, Fed. Cas. No. 7,578; Cunningham v. Insurance Co., 26 Fed. 47; Astsrup v. Lewy, 19 Fed. 536.

Though the bottomry bond is invalid as an express contract, the actual advances of money made at the port of refuge for the needs of ship and cargo are a lien on the ship provided they were for expenses which the ship was bound to pay; and this depends on the enquiry whether the case is one for general average, or not.

If the expenses at Valparaiso arose through the insufficiency or unseaworthiness of the ship at the commencement of the voyage, and not through sea perils, no general average charge whatever can be made against the cargo; the ship and owners would be bound to pay all the port of refuge expenses, though not liable for the extra charges attending the unauthorized express contract of bottomry. On this view of the case, the libellants would be entitled

to credit for all the advances made, with interest, but without the bottomry premiums and commissions.

If, on the other hand, the ship was seaworthy, and the putting back to Valparaiso was made necessary, as the owners contend, in consequence of leaks caused by the straining of the ship in violent seas, then the ship is liable only for so much, if anything, as still remains chargeable against her on general average account. The statement in Grace & Co.'s letter of January 4, 1894, i. e., that the reason for taking bottomry was to cover fully the ship's liability in general average, indicates that Grace & Co. did not then intend to advance on the credit of the ship, or to hold her liable for, anything beyond her liability in general average. If the bottomry bond is not sustainable as an express contract, therefore, the libellants cannot claim a maritime lien beyond the amount which they did thus advance on the actual credit of the ship.

The question whether the leak which required the ship to put back to Valparaiso is to be ascribed to unseaworthiness, is an embarrassing one. The ship was built in 1881; she was then rated in the best class of wooden sailing ships, and at the time of this occurrence was, therefore, but twelve years old. She passed her half term survey in 1887, and had been dry docked and examined generally in New York on January 21, 1892. She sailed from New York on February 12, 1892, and arrived at Valparaiso on May 20th. Her fore and main topmasts had been carried away on the 9th of April, with some other slight damage; but her hull was not injured, and her perishable cargo was delivered at Valparaiso in good order, and no leaks were caused by that accident. Her spars and rigging were then repaired; her hull was sound and needed nothing, save that some copper plates were replaced which had been torn by the wreck of the topmasts. From Valparaiso she proceeded in ballast to Puget Sound, and returned with lumber to Junin, Chili, where she arrived on March 27, 1893, and there delivered her cargo in good order. It was while the vessel was at Junin that the charter to the libellants was executed. On the 15th of June she went to Caleta Buena, 13 miles below Junin, and immediately commenced taking in cargo, and on the 26th of July, as above stated, sailed for New York. The certificate given her on repair in New York in January, 1892, reads, "Caulking tested and found good; metal sheathing on bottom re-nailed; well repaired, making good for 18 months." This 18 months had just expired when she sailed from Caleta Buena.

At the time when the ship put about for Valparaiso on the 13th of August she had made during her 18 days sail about 1,500 miles direct progress upon her course, though she had logged a much greater distance. Until the 5th of August the log does not show any bad weather beyond some hard squalls and strong breezes. On Monday, August 7th, 1893, the log begins as follows:

"P. M. commences with strong winds and cloudy weather, with a heavy head sea, ship pitching heavily."

During the rest of that week the weather was mostly moderate, with occasional squalls and fresh breezes. Up to this time as respects the pumps the entries in the log are usually the same— "Pumps attended to every 4 hours;" and the testimony is that there was no leaking beyond the ordinary small amount of water. On Sunday, August 13th, 1893, the log is as follows:

"P. M. Commences with strong wns (winds) & cloudy wr. (weather) with a tremendous heavy S. S. W. sea running, ship pitching and straining heavily; ship commencing to make considerable of water; wind increasing, stowed top G (gallant) sails, large quantities of water coming on deck.

"4 p. m. a heavy sea struck ship on starboard bow, starting bow-sprit and doing other damages causing the ship to make a great deal more water; main pumps and wind mill pump constantly going.

"Midnight, a moderate gale & dwr. (dull weather).

"4 a. m. Dwr. (dull weather).

"11 a. m. as the ship was making so much water Captain Douglass consulted his officers and crew as to the best course to pursue, and it was decided to put back to Valparaiso for the benefit of ship and cargo and all hands concerned.

"11:30 a. m. squared away and ran ship for Valparaiso.

"Noon. A moderate gale and dark cloudy weather; ship rolling heavily and taking heavy water on deck.

"Pumps constantly going.

"Lts. (lights) attended to."

During the two days following the log recites a moderate gale and very heavy seas; ship pitching and straining heavily, on the 15th taking heavy seas on board; pumps constantly going. She arrived at Valparaiso on the 24th of August. In still water she did not leak. Upon discharge of the cargo and three surveys, it was found that the butts in the water ways were slack, and the seams around the bow in the main deck very open; that the seams around the main hatch coaming showed some movement; the covering-board seam slack; one hanging knee on the port side broken; one on the starboard side, and one lodging knee badly split; many nails started in the sheathing, and the copper wrinkled in parts; where sheets of copper were stripped off, the seams were found in fair condition. Captain Elliott, Lloyd's surveyor at Valparaiso, of long experience, who was examined with others by the libellants on interrogatories, testifies:

"Q. State what in your opinion was the cause of the vessel's leaking, and give your reasons for your opinion. A. The vessel had strained from severe weather."

Later, he says he found very little signs of heavy strain; and two other witnesses at Valparaiso say there was little or no straining. Captain Woodworth, of the ship Eureka, then in Valparaiso, saw the Mauna Loa when she came in, and he testifies that her copper was wrinkled and off in places; that the seas and weather described in the log would tend to strain the vessel, and would wrinkle her copper and tend to weaken the vessel; that it would be a pretty heavy sea that would start the bow-sprit, and that this would strain the ship around the knightheads where the bowsprit was secured, and make her leak in the seams; and that the seas in that region were as bad as around Cape Horn, or worse.

The repair of the ship consisted mainly in caulking, though the broken knees and stanchions were repaired, and many other minor items were attended to.

The testimony of the captain adds considerable to the statements of the log, which he testifies does not adequately represent the severity of the seas. He says on the 13th it was the worst sea he ever had, for it was a cross sea; that the seas are more regular off Cape Horn; that he had been around there several times, and that he had never had anything like this. He testifies also that on the 11th and 12th of August there were heavy head seas, the ship drifting into it very heavily; ship straining very heavily. The mate who made the entries had left the ship at Valparaiso. His evidence was not obtained. The testimony of the steward in the above particulars corroborates that of the captain; and the evidence of Captain Woodworth of the Eureka, and Captain Barstow, of the Independence, is to the same effect.

The master testified that at Junin the ship was scraped and all her seams tried with a housing iron, and that anything found soft was filled up with oakum; and her waterways were carefully overhauled; that before loading the cargo for Caleta Buena she was again examined, and her condition was good and everything sound. The respondents rely on these proofs as sufficient evidence of seaworthiness, and of sea perils as causing strain of the ship and the leak which required her to put back to Valparaiso. If this is correct, the case is one for general average, and the cargo must pay its share.

The libelants contend that the above proof is insufficient; that no such examination of her metalling and seams was had as was necessary upon the expiration of her certificate; that the entries in the log do not show any such severe seas as to cause such leaks in a seaworthy ship; that there was substantially no straining of the ship; and that the fact that the ship needed practically no other repair than re-caulking, is conclusive proof that this disaster would not have happened had her caulking been in proper condition at the commencement of the voyage. The testimony of the captain, it is argued, is merely an attempt to supply, by exaggeration, and by additions to the log, its alleged insufficiency to support the defendants' case.

I have already referred to the testimony of the captain that she was examined at Junin and Caleta Buena, and that her sides, seams, and waterways, were put in good condition. The steward confirms this testimony. Both also testify that before loading at Caleta Buena two persons came aboard and inspected the seams, and the general condition of the ship, one of whom was the agent of Grace & Co., who attended to the loading; that they had tools for the purposes of inspection, and at the end of the examination, in answer to inquiries, stated that they found the ship all right. Mr. Peake, the local agent of the libellants at Caleta Buena, who had general charge of the loading there, testifies, however, that no inspection of the vessel was made by him, or under his authority. This testimony seems to me insufficient to discredit the tes-

timony of the master and steward as to this additional examination, which in itself was quite natural and probable.

The testimony of the workmen in libellants' behalf at Caleta Buena, so far as it is based on mere reports of others, is entitled to no weight. Their testimony as to the leaky ports is explained fully in the captain's testimony, and has no connection with this disaster. The testimony of Sandovalla, whose deposition was not signed because he was not paid $100, cannot be admitted.

The evidence of the surveyors at Valparaiso leaves no doubt that there was no heavy straining; and yet Mr. Elliott, whom I regard as the most competent of the experts there, testified that the "cause of the leak was the straining of the vessel." There was evidence of some movement of the parts about the main hatch, and in other places. Whether the knees and stanchions were broken at this time, and from this cause, is not stated; it is, perhaps, inferable that they were. The fair conclusion from the whole testimony seems to me to be that there was some straining of the vessel, though no heavy straining; and that this arose from heavy seas, while under a press of sail before the wind; and this is consistent with the evidence that the ship leaked while sailing in rough seas, but did not leak in still water.

It is urged that after the lapse of the 18 months named in the certificate the vessel should have been re-caulked at Caleta Buena as she was afterwards caulked at Valparaiso, and that had this been done, the expenses at the port of refuge would not have been incurred. It cannot, of course, be demonstrated that the leak would not have occurred had a similar re-caulking been done at Caleta Buena. But assuming that the accident would not have occurred had the ship been re-caulked, that would not establish the ship's liability. For the question is not whether fresh caulking would have made the ship stronger, or would have endured more than old caulking; but whether with the caulking as it was when she left Caleta Buena the ship was in a reasonably fit condition for the contemplated voyage. The Edwin I. Morrison, 153 U. S. 210, 211, 14 Sup. Ct. 823, 825; The Sintram, 64 Fed. 884; The Titania, 19 Fed. 105-108. Reasonable fitness does not mean the highest degree of efficiency, etc., but only such a degree of soundness and fitness as in the judgment of maritime experts, renders her able to encounter all the ordinary perils to be reasonably anticipated upon the voyage.

The fact that the period of 18 months named in the last certificate had expired, is not of itself controlling. Such a certificate has no absolute character. In such certificates some period must be named; and that will naturally be the shortest estimated period of confident safety, barring accidents or extraordinary circumstances. The presumption of sufficient caulking which the certificate affords, must, therefore, hold for a longer or shorter time than that named, according to the weather, the trials, and the casualties to which the vessel has been exposed. In this case the comparatively good weather which the ship's log shows she had during this 18 months after the certificate was given, would furnish a

natural presumption that her condition would be good for a longer period than that named in the certificate. Moreover, this was not an old and decrepit ship; she was in general stout and staunch, in this respect differing from some of the cases cited. The evidence of the master as to heavy cross seas is not contradicted by the log, but indirectly supported by it, as well as by the testimony of Captain Woodworth.

In the recent case of The Warren Adams, 20 C. C. A. 489, 74 Fed. 415, Judge Wallace, in the circuit court of appeals, in commenting on this subject thus states the long settled law:

"Where a vessel soon after leaving port becomes leaky, without stress of weather or other adequate cause of injury, the presumption is that she was unsound before setting sail. The law will intend the want of seaworthiness, because no visible or rational cause, other than latent or inherent defects in the vessel, can be assigned for the result. But where it satisfactorily appears that the vessel encountered marine perils which might well disable a staunch and well manned ship, no such presumption can be invoked. And where for a considerable time she has encountered such perils and shown herself staunch and strong, any such presumption is not only overthrown, but the fact of her previous seaworthiness is persuasively indicated."

In the present case, before the ship put about she had logged a distance almost equal to a voyage to Europe after sailing from Caleta Buena. The seas described in the log were sufficient to start the bowsprit; and cross seas of that severity seem to me also fully adequate to cause some straining of the ship, such as is indicated by the evidence before referred to in the movement of the parts, and the wrinkling of the copper, and thus to produce this damage. That there was some straining of the ship seems to me the more probable not merely from the fact that the ship ceased to leak in still water, but from the further fact that the distance logged on the 13th was 201 knots, or an average of upwards of 8 knots an hour for 24 hours. The libellants argue that this makes very improbable the existence of any such heavy seas as are alleged; but the ship had an aft wind and was no doubt making all the speed she could. It is not impossible that in his desire to expedite the voyage the master carried more sail than was prudent with so stiff a cargo as nitrates. A press of sail with such a cargo, in severe cross seas, might easily produce straining enough to start this leak, when with a more buoyant cargo, or less canvass, the vessel might have passed through the same seas unharmed.

Another consideration not to be wholly overlooked is the fact, evident from the testimony, that the contemporaneous judgment of the matter on the spot, at Valpariso, was that the case was one of general average, i. e., damage from a sea peril. No doubt the previous history of the vessel was not then fully known; but the facts, and the fair inferences therefrom, as respects the condition of the vessel on arrival, as indicating the causes of the leak, were likely to be fully appreciated then and there, and quite as adequately, as upon the depositions since taken.

On the whole evidence, which I have found very perplexing upon this point, I think the vessel should be held seaworthy, and the damage in question, therefore, adjusted as general average.

The loss of nitrates was a natural incident to the unloading and re-loading in Valparaiso, and should enter with other items into the general average account. If the parties cannot agree upon the adjustment made, a reference may be taken to ascertain what amount, if any, is owing by the ship to the cargo; and the amount so ascertained to be allowed to the libellants as an offset to the freight due.