LINKLATER v. HOWELL et al.

(District Court, S. D. New York. May 10, 1898.)

1. CHARTER PARTY—CONSTRUCTION OF DUNNAGE CLAUSE.

The provision that a charterer shall "furnish rattans, sapan wood and bamboos at charterer's option as much as required by the master" does not require the master to call for or use such woods when the ship already has a sufficient supply of customary wood dunnage.

2. SUGAR CARGO—SHORT DELIVERY—SEA PERILS—CUSTOM-HOUSE WEIGHTS—FREIGHT PAYABLE.

Of a cargo of 14,263 baskets of sugar shipped in Java, 52 were broken up or missing on delivery at New York: of the 52, 27 could be identified by pieces; the remaining 25 were represented by a heap of small fragments. The vessel met heavy weather, and in a part of the cargo many bags had burst and there had evidently been much working and break age from rolling and pitching. On arrival the weight was carefully taken by the custom-house authorities, showing less than the ordinary loss of weight as compared with that given by the bills of lading, but considerably less than the weights taken by unofficial weighers, 15 months afterwards. *Held*, that the custom-house weight was entitled to superior credit as to the weight on arrival, and that freight should be computed on that weight; that the evidence indicated a delivery by the ship of all the sugar received on board, and that the 25 missing baskets were sufficiently accounted for by sea perils and the promiscuous fragments, and that no shortage was established.

This was a libel in personam by William Linklater against Benjamin H. Howell and others to recover freight under a charter party.

Convers & Kirlin, for libelant.

Butler, Notman, Joline & Mynderse, for respondents.

BROWN, District Judge. The questions at issue are whether the consignees of the sugar should pay freight according to the weight as determined by the custom-house weighers, or as indicated upon a long subsequent weight, as well as pay damages for the nondelivery of 31 baskets of sugar.

I have examined the evidence and the briefs with care. It will be sufficient to state my conclusions without a discussion of the very numerous and complicated details involved, or a specific reference to the arguments of counsel.

1. The weight of evidence clearly establishes that the dunnage was sufficient and in accordance with the customary practice for such cargoes.

2. The provision of the charter party that the charterer should furnish rattans, sapan wood or bamboos at charterer's option "as much as required by the master" was not designed to dispense with the use of such ordinary wood dunnage as the ship might have, but only to require the charterer to make good any deficiencies in what the ship had by a supply of dunnage of the kinds specified, those being the kinds most easily obtainable in Java. As the ship had a sufficient supply of ordinary wood dunnage, the master had no right to demand of the charterers a supply of additional dunnage, nor did he do so; and the charterers did not offer to furnish any bamboo dunnage to be used in place of the ordinary wood dunnage, which the ship

already had.    This is evidence of the practical construction placed on this clause by both parties.

3. The number of baskets broken and destroyed was unusually large.    The parts of 27 baskets were identified, and are thus specifically accounted for.    Of the number mentioned in the bill of lading, 6 being noted as disputed and one being lost overboard, there remain 25 represented only by promiscuous fragments.    It is impossible to say however that the large heap of débris, including the fragments of baskets so much ground up or broken as to be incapable of being put together as baskets, is not sufficient to represent the missing 25; and if the weight of the custom-house weighers is to be accepted as correct, the result shows much less than the usual loss of weight in the transportation of such a cargo; so there would be no sufficient ground to suspect from the absence of complete identification of all the baskets that the ship had not delivered all the sugar she had received on board.    There is general evidence that she did deliver all she received except one basket lost in discharging.

Doubtless a reasonable account must be given for the failure to deliver the requisite number of baskets in specie.    Kerruish v. Refining Co., 42 Fed. 511, and 49 Fed. 280.    But I think this is sufficiently done.    The bark encountered heavy weather.    In one gale nearly half her sails were blown away, and she rolled heavily for about 30 days.    The baskets were from different districts and of different degrees of strength.    When affected by dry rot they become brittle.    The whole number of baskets was 14,263.    The evidence shows that the principal loss of baskets was in the second, third and fourth tiers from the bottom, in the forward part of the hold.    This indicates the probability that that portion of the shipment might have been in baskets of inferior quality; and when once some vacant spaces were made by the bursting of some baskets, others next to them of quality similar would be likely to be broken, and afterwards in the continuous working of the cargo during long-continued heavy rolling the broken baskets would naturally be more or less ground up into fragments incapable of being pieced together.    The small number of only 25 that became indistinguishable except as fragments in a cargo of upwards of 14,000, seems to me in no way incredible or improbable under the circumstances proved, and not indicative of any appropriation of the baskets on the part of the ship or her crew.    I think, therefore, that the broken unidentified baskets are sufficiently accounted for by the circumstances of the voyage and included in the excepted sea perils.    See The Warren Adams, 20 C. C. A. 487, 74 Fed. 415, 416; The Sandfield, 79 Fed. 375; The Mauna Loa, 76 Fed. 837.

4. The custom-house weight of the sugar taken on the discharge of the cargo shows a less percentage of loss than usual on such voyages.    But the testimony on both sides is strong as to the care and accuracy of the custom-house weighers; and the percentage of loss on such voyages varies greatly under different circumstances.

5. The weights taken subsequently, after 15 months' storage at Hoboken including two summers, cannot be accepted as evidence of the weight of the sugar on arrival 15 months before, superior to

the evidence of the custom-house weighers, who carefully took the weight at the time; certainly not in the absence of any positive proof as respects the care of the sugar meantime, and the possible causes of loss of weight in the interval. Freight was payable on delivery and according to the weight. No objection was made to the custom-house weight at the time of discharge, but only to the failure to produce the 25 or 30 missing baskets; and the proofs, as I have said, sufficiently account for these. Had any exception been taken by the consignees to the custom-house weight, it should have been made at the time of discharge. It is said that the cost of reweighing would always exceed any probable error. If that is so, it confirms what is otherwise indicated as the practice and the understanding of both parties when freight is to be paid according to the weight of sugar delivered, viz. that the custom-house weight should be accepted for the purpose of computing the freight due. As the ship is entitled to the payment of freight on delivery, and the consignee is not entitled to delivery except on payment of freight, if either party is dissatisfied with the official weight, steps should be at once taken to ascertain the true weight in order that the ship may receive her freight and the consignee his goods. If this is not done, and delivery of the sugar is made and accepted upon the basis of the custom-house returns without objection at the time, such weight should be regarded as the agreed weight, not to be subsequently set aside except upon very clear and conclusive evidence of mistake. Here there is no such clear evidence. There are too many doubtful circumstances to give the subsequent weighing any superior credit. There may have been loss during the interval of 15 months through repeated handling of the sugar, or by pilfering or theft; the heat of two summers in a Hoboken warehouse would naturally dry out the sugar; the additional loss of weight during those 15 months, even if the subsequent weighings were accurate, was at about the same rate only as the loss arising during the 6 months that the sugar was in the ship's hold subject to much less drying influences; and the subsequent weighing may have been less exact, the testimony being that the weights returned by private weighers are usually somewhat smaller than the returns of the custom-house weights.

The libelant is, I think, entitled to the amount claimed, less the value of the basket lost overboard.