## THE WARREN ADAMS.

### CEBALLOS et al. v. THE WARREN ADAMS et al.

#### (Circuit Court of Appeals, Second Circuit. March 3, 1896.)

**1. SHIPPING—DAMAGE TO GOODS—PRESUMPTIONS.**

When goods are damaged while in possession of the carrier, there is a prima facie presumption that the injury is occasioned by the carrier's default, and the burden is on him to prove that it arose from a cause for which he was not responsible. If it appear that it was caused by the dangers of navigation, or some other cause within the exceptions of the bill of lading, the burden is then on the shipper to show that the damage might have been avoided by the exercise of reasonable care and skill.

**2. SHIPPING—"PERILS OF THE SEA."**

"Perils of the sea" mean "all marine casualties resulting from the violent action of the elements, as distinguished from their natural, silent influence upon the fabric of the vessel; casualties which may, and not consequences which must, occur."

**3. SAME—AFFREIGHTMENT—SEAWORTHINESS—BURDEN OF PROOF.**

Where cargo was damaged by the springing of a leak in the centerboard trunk of the vessel, *held* that, under the implied condition of seaworthiness, the burden was on the vessel to show that at the commencement of the voyage the centerboard trunk was in such good condition as to withstand the stress to which, on such a voyage, it might reasonably have been subjected, but that this burden might be satisfied by general evidence of seaworthiness.

**4. SAME—PRESUMPTIONS.**

Where a vessel, soon after leaving port, becomes leaky, without stress of weather, or other adequate cause of injury, the presumption is that she was unseaworthy before setting sail. But when, for a considerable time, she successfully encounters marine perils which might well disable a staunch and well-manned ship, any such presumption is overthrown, and her previous seaworthiness is persuasively indicated.

**5. SAME—EVIDENCE OF SEAWORTHINESS.**

Where damage was done to the cargo of a schooner by springing a leak in her centerboard trunk while tacking in a heavy gale, *held*, that the fact that a shipwright employed to calk the vessel, where necessary, before commencement of the voyage, had inspected the centerboard trunk, and tried some of the seams with a calking iron and mallet, and, finding them sound, had not examined further, was not to be ignored on the question of seaworthiness, and that, in connection with the fact that the vessel had successfully encountered a heavy gale for some days after leaving port, it was sufficient proof of the implied warranty of seaworthiness. Lacombe, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

This was a libel by John M. Ceballos and others against the schooner Warren Adams and others to recover for injury to cargo. The district court dismissed the libel, and the libelants appealed.

George A. Black, for appellants.

Robert D. Benedict and Benedict & Benedict, for appellees.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge. The appellants, who were the libelants in the court below, brought this action to recover damages for breach of contract on the part of the schooner Warren Adams to deliver, in like good order as received, a cargo of sugar consigned

to them. The cargo was shipped on the schooner at the port of Matanzas, from which she sailed January 16, 1893, and, while upon a voyage to New York, was injured by sea water which entered the schooner through seams in the centerboard trunk. By the terms of the bill of lading, the cargo was to be delivered in like good order as received, "the dangers of the seas only excepted." The district court dismissed the libel.

The real question in the case is whether the loss is attributable to the perils of the sea, or to the unseaworthiness of the schooner. The proofs show that the vessel was a three-masted schooner, 183 feet long, and of 634 tons. Her centerboard trunk extended through the lower hold and the between-decks, being 30 feet long in the lower hold. She had been calked and metaled at Philadelphia in August, 1892, but whether anything was done at that time to the centerboard trunk does not appear. On her last voyage previous to the voyage from Matanzas she had carried a cargo of lumber from Mobile to that port, and had used her centerboard once on that voyage. After her lumber was discharged at Matanzas, her master employed a carpenter for half a day to look her over and calk her where necessary. He inspected her centerboard trunk, and tried some of the seams on both sides with a calking iron and mallet, and, finding them sound, did not examine further. She left on her voyage from Matanzas early in the morning of January 16th, and on the morning of the 18th, while tacking in a heavy gale, with her centerboard partly down, she sprang a leak. The leak was found to be in the trunk of the centerboard, in the lower hold, and an examination showed seams about 10 feet long, on both sides of the trunk, where the oakum had worked out; there being two such seams on one side, and one upon the other. The seams were calked and fastened temporarily, and afterwards she did not make any appreciable amount of water. She had encountered bad weather from the first night of her voyage until she sprang the leak, and had used her centerboard in tacking previously, upon three occasions, in heavy seas. When the vessel arrived at New York the condition both of the cargo and of the vessel herself was examined by the underwriters upon the cargo, and, although it was then manifest that the cargo had suffered a considerable amount of damage, no claim was then made that the loss had not been occasioned by dangers of the sea. Shortly afterwards her centerboard was removed, and she was converted into a keel vessel, her owner being advised that thereby she could be insured for a lower premium. The fact that it was not known at that time that there would be a claim for damages explains the omission to make a careful re-examination of the centerboard trunk.

When goods in the custody of a common carrier are damaged after their reception, and before their delivery, there is a prima facie presumption that the injury is occasioned by the carrier's default, and the burden is upon him to prove that it arose from a cause for which he was not responsible. If it appears that the injury has been caused by the dangers of navigation, or some other cause within the exception of the bill of lading, then it devolves

upon the shipper to make out that the damage might have been avoided by the exercise of reasonable care and skill upon the part of the carrier. No loss which is the result of ordinary wear and tear, or a necessary consequence of the employment of the vessel in the usual course of navigation, is a loss by "perils of the seas." That term may be defined as denoting "all marine casualties resulting from the violent action of the elements, as distinguished from their natural, silent influence, upon the fabric of the vessel; casualties which may, and not consequences which must, occur."

It is insisted for the appellees that, under the implied condition of seaworthiness incorporated by the law in every contract of affreightment between a cargo owner and a common carrier by ship, the burden of proof is upon the carrier to show that at the commencement of the voyage the vessel was in a suitable condition to encounter all common perils and dangers with safety, and was free from any latent defect impairing her ability in this respect; in other words, that it must be affirmatively proved, to exonerate the present vessel, that her centerboard trunk was, at the commencement of the voyage, in such good condition as to withstand the stress to which, on such a voyage, it might reasonably have been expected to be subjected. To this we agree, but without intending to imply that the burden of affirmative proof cannot be satisfied by general evidence of seaworthiness. It has never been supposed—certainly, it has never been decided—that there is a more stringent presumption or rule of evidence in respect to proof of seaworthiness when the question arises under a bill of lading, or other contract of affreightment, than when it arises under a policy of marine insurance. In such policies the implied warranty of seaworthiness is a condition precedent to the obligation of insurance. Parsons says: "As seaworthiness is a condition precedent to the right of the assured to recover, it would seem to belong to him to establish that fact, and so it has been held. Now, however, the law is different in many of the states." 1 Pars. Mar. Ins. 378, 379. The question of the burden of proof, and of the presumptions, was quite fully considered in Lunt v. Insurance Co., 19 Blatchf. 151, 155, 6 Fed. 562; and the conclusion was reached that seaworthiness is to be assumed as a fact, in the absence of countervailing facts. Among other authorities referred to in the opinion was the English case of Pickup v. Insurance Co., 3 Q. B. Div. 594, in which all the judges of the court of appeals agreed—reversing the court below— that the presumption of law is prima facie in favor of seaworthiness, and the burden of proof to the contrary is on the insurer.

In the present case the question of the burden of proof is an academic rather than a practical one. The vessel had been tried by violent seas for 36 hours before she sprang a leak, and the sufficiency of her centerboard trunk had been repeatedly demonstrated. It is not surprising that the oakum should have worked out of some of the seams, in the violent straining to which the trunk must have been subjected on the several occasions when she tacked. Where a vessel, soon after leaving port, becomes leaky, without stress of weather, or other adequate cause of injury, the presumption is

that she was unsound before setting sail. The law will intend the want of seaworthiness, because no visible or rational cause, other than a latent or inherent defect in the vessel, can be assigned for the result. But, where it satisfactorily appears that the vessel encountered marine perils which might well disable a staunch and well-manned ship, no such presumption can be invoked. And where, for a considerable time, she has encountered such perils, and shown herself staunch and strong, any such presumption is not only overthrown, but the fact of her previous seaworthiness is persuasively indicated. Patrick v. Hallett, 3 Johns. Cas. 76; Potter v. Insurance Co., 2 Sumn. 197, Fed. Cas. No. 11,339; Walsh v. Insurance Co., 32 N. Y. 427; Wilson v. Jones, L. R. 2 Exch. 143. Besides the presumption afforded by the circumstances referred to, the examination of the shipwright, made just previous to the commencement of the voyage, is evidence which ought not to be ignored. Although he did not make an examination of all the seams in the centerboard trunk, it is reasonable to assume that those he did examine were in such condition as to justify an experienced man in believing that a more critical inspection was not necessary.

The contention for the appellees that the master of the vessel was inexperienced, and improperly used the centerboard, does not merit serious consideration, there being an adequate cause to account for the leak without resorting to that theory. We therefore conclude that the loss was caused by the dangers of the sea, and not by reason of the unseaworthiness of the vessel, or any fault for which her owner is responsible.

The decree of the district court is affirmed, with costs.

LACOMBE, Circuit Judge (dissenting). I am unable to concur in the opinion of the majority of the court in this case. There is nothing in the nature of the disaster, or in the subsequent appearance of the leaky seams, to indicate whether they were or were not well calked before the voyage began. The rule laid down in The Edwin I. Morrison, 153 U. S. 214, 14 Sup. Ct. 823, seems to require the ship, under such circumstances, to show that before the voyage there was an inspection of the part which subsequently gave way, with the known and ordinary tests, to ascertain whether or not it was in seaworthy condition. I do not find in the record any competent proof that such an inspection was had at any time, either of those seams in the centerboard trunk which were in the between-decks, or of those other seams in the trunk which were located only 20 inches below the between-deck beams. Since those were the two places where the leaks developed, and no inspection of them is proved, the schooner has failed to excuse herself, if the Morrison Case is to be followed.