## THE SANDFIELD.

### AMERICAN SUGAR-REFINING CO. v. THE SANDFIELD.

#### (District Court, S. D. New York. February 27, 1897.)

**1. DAMAGE TO CARGO—BROKEN RIVET—SEA PERILS.**

At the close of a stormy voyage on which a steel steamer was damaged about her decks, had her wheel chains parted, and her propeller shaft fractured by heavy seas, a leak was discovered around a rivet in the after port bilge. Three-sixteenths of an inch of the outer end of the rivet was gone; the end of the remaining part showed evidence of fracture. This bilge had been sounded daily before the heavy weather began, and had been opened and cleaned by the crew before the loading of the cargo. No water was entering it at such times. *Held*, upon evidence of similar loss of rivet heads in previous cases, probably from excessive vibration through the racing of the propeller in rough weather, that the rivet was fractured by that cause, which was a peril of the sea.

**2. SAME—SEAWORTHINESS—INEQUALITY IN STRENGTH OF RIVETS.**

The cylindric part of the broken rivet was somewhat oblique to the plane of the inner head, showing that the holes in the overlapping plates through which it had been driven when hot were not perfectly true. Both heads

of the rivet had something of a cant. No other was broken. *Held*, that although the cant at both ends might diminish its endurance by subjecting it to an unequal strain, yet, not being a weak or improper rivet, mere inequality in the strength of the rivets would not amount to unseaworthiness or a violation of a charter provision that the ship shall be "tight, staunch and strong."

3. SAME—SEA PERILS—PRESUMPTIVE CAUSE.

Where it satisfactorily appears that sea perils have been encountered adequate to cause damage to a seaworthy ship, and there is general proof of seaworthiness, the damage is presumptively due to such perils.

4. SAME—INJURY BY SEA WATER—EXCEPTION OF LOSS BY PERILS OF THE SEA.

Damage to cargo by sea water entering the hold around a loose rivet, which has been fractured by perils of the sea, is a loss by perils of the sea within the exceptions of a charter party and bill of lading.

5. SAME—DILIGENCE IN DOCKING FOR EXAMINATION—HARTER ACT.

A comparatively new steel steamer, built by first-class makers, which had passed its first Lloyd's survey in February, 1895, when the whole bottom was inspected and the riveting found sound, started on the voyage in question in January, 1896. No accident to the bottom had intervened. *Held*, that reasonable care of a vessel does not require docking for examination more than once a year, in the absence of some known necessity for it, and that accordingly there was no lack of diligence in the inspection of the ship.

6. SAME—CHARTERED SHIP—CLAUSE "ALL CONDITIONS AS PER CHARTER PARTY" IN INDORSED BILLS OF LADING—EFFECT OF CHARTER EXCEPTIONS—LATENT DEFECT.

The goods were shipped in a chartered ship by the charterers, and the bills of lading contained the clause, "All conditions as per charter party.". *Held*, that the receivers of the cargo, as indorsees of the bills of lading, took the goods subject to the provisions of the charter party; that the ship was entitled to the benefit of an exception of "latent defects in the hull" contained in the charter party; and that if there was any defect in the rivet, it was latent, and within the exception.

7. SAME—LEAVING SLUICE SHUT—OPERATION OF HARTER ACT NOT IMPLIEDLY EXCLUDED.

The charter party contained a number of exceptions, including perils of the sea, and a further provision that "nothing herein contained shall exempt the shipowner from liability to pay for damage to cargo occasioned by improper opening of valves, sluices or ports, or by causes other than those above excepted." *Held* (1) that the damage was by "a cause above excepted," in the sense of the clause; (2) that the engineer's neglect in leaving the sluice shut was not an "improper opening" of it; (3) that this clause did not impliedly exclude the operation of the Harter act or deprive the ship of the benefit of the exceptions therein contained.

8. SAME—HARTER ACT—"MANAGEMENT"—LEAVING SLUICE SHUT.

The opening of a sluicegate, designed to empty the bilges, was neglected during heavy weather. The accumulating water overflowed the bilges and damaged cargo properly stowed in the holds. *Held*, that the neglect to open the sluices was a fault in the "management of the ship," within the third section of the Harter act, and that the ship and owners were exempted thereby from liability for the resulting damage.

Libel by the American Sugar-Refining Company against the steamship Sandfield to recover the sum of $10,000 for damage to a cargo of sugar.

Cowen, Wing, Putnam & Burlingham, for libelant.

Convers & Kirlin, for claimant.

BROWN, District Judge. The above libel was filed to recover damages to a large quantity of sugar in Nos. 3 and 4 holds of the

steamship Sandfield on her voyage from Alexandria, Egypt, to New York, in February and March, 1896. The damage was caused by a great accumulation of sea water. How the water got access to those holds was not known until after the cargo was discharged and the vessel docked, when a defective rivet in the outer plating of the ship was found, leading into the port bilge or sluiceway, about three feet forward of the sluicegate, in the stuffing-box bulkhead, and a few inches below the flooring over the limbers, about fourteen feet below the water line.

The vessel sailed from Alexandria on January 30, 1896. There was no leak of any kind until February 14th, four days after passing Gibraltar. On that day weather of extraordinary severity set in, and continued gales were encountered until arrival at the Delaware Breakwater on March 6th. In this weather the ship received much injury from the seas; two lifeboats were damaged, one washed away; the winches were damaged, pipes and ventilators on deck carried away, bridge, rails and stanchions bent and broken; the after deck started in two places, the wheel chains parted several times, shackles parted, and the propeller shaft fractured through racing, while pitching in the heavy seas. The leak occurred during this stormy weather. The defects in the rivet, when examined, were sufficient, according to the estimate of Mr. Mancor, the libelant's expert, to fill the port bilge, which was 80 feet long from the sluicegate to the bulkhead forward, in about seven hours. Had the sluicegate leading into the well been opened twice a day during the stormy weather, as was customary at other times, no such accumulation of water would have occurred, as the leak would have been soon discovered in pumping the water from the well, and the pumps were sufficient to prevent any accumulation of water or consequent damage. But the opening of the sluicegates during the heavy weather was neglected; and the accumulating water having overflowed the bilges, gradually engulfed the bags of sugar, and formed within the bilges a candied mass, which at length somewhat checked the leak, but not without a large loss and damage to the sugar.

When the defective rivet was found on docking the ship, it was knocked in, and has been produced in court. The cylindric part is somewhat oblique as respects the plane of the inner head, which is intact, showing that the holes in the overlapping plates through which it was originally driven when hot, were not perfectly true, so that both heads must have had something of a cant. The exterior end of the rivet, after being driven in hot, was battered down, so as to fill up the flaring countersink on the outer surface of the ship's plate, extending into the plate about three-eighths of an inch in depth, and thus forming a clinch or outer head, flush with the plate. The defective rivet proves to be three-sixteenths of an inch short, and the countersunk portion, which should be flaring outward, is gone. The defendant contends that the rivet and the rivet hole were in good order at the time when the vessel sailed; that the outer rivet head or countersunk portion was broken off

by fracture, probably through the great vibration caused by protracted racing in heavy weather; that if the rivet was defective at the time of sailing the defect was latent, and therefore within the express exception of the charter under which the sugar was shipped; and that the failure to open the sluicegate was negligence in "the management of the ship," for which, under the Harter act, the respondents are not answerable.

The libelant contends that the rivet was defective when the ship sailed, and that the damage falls within the express liability created by the provisions of the charter and the bill of lading, and that those provisions supersede the Harter act in the present case, even if "due diligence" were shown, which, it is claimed, is not proved.

Before considering the terms of the charter and bill of lading, my conclusions concerning some controverted matters of fact should be stated. The clear weight of evidence seems to me to show the following:

1. That the exterior end of the rivet to the extent of about three-sixteenths of an inch, including all the flaring or countersunk portion, was gone at the time the ship was docked and the defect discovered, i. e., before the rivet was driven out.

The loss of three-sixteenths of an inch in length could not have been caused by the two or three blows of the hammer by which the rivet was driven back. Had the rivet been then entire, it could not have been driven back without first cutting out, or breaking off, the flaring portion which forms the clinch or head. It was neither cut nor broken off at that time; and it could not have got into the present shape by rust alone. Had the flange been broken in driving back, or had the flange rusted away, the cylindrical part of the rivet would have shown its full length, or nearly its full length, instead of being three-sixteenths of an inch short; and if broken off, the circumference at the end would naturally also have shown marks of forcible breaking all around, quite different from those which the rivet now exhibits. On the other hand the rivet does show upon the circumference, at the outer end, some toothed marks of rupture, such as would be likely to attend a fracture at the depth of the countersink, viz. three-sixteenths of an inch; and I accordingly find that there was such a fracture and loss of the outer end of the rivet to that extent.

2. This fracture and the loss of the countersunk portion of the rivet occurred some time during the heavy weather that the ship encountered, beginning on February 14th, more than two weeks after the ship sailed from Alexandria. This is the necessary inference from the fact that the rivet hole was about 14 feet below the water line, and from the facts (a) that prior to the ship's arrival at Alexandria, there had been no noticeable leak; (b) that no leak was visible at Alexandria, when the limber boards were all taken up and the pockets of the limbers carefully cleaned at the place where the defective rivet was afterwards found; and (c) that after sailing from Alexandria, and for 16 days until heavy weather set in, the sluices were open daily and no water was found up to that

time, nor on the preceding voyage from Newport to Genoa, when the sluices were opened daily. There is no known cause to which the loss of the countersunk part of the rivet can be ascribed before the heavy weather on this voyage; and if the loss of the rivet head had taken place at some indefinite time before sailing, there would have been some previous leak noticeable. The rivet, it is true, now shows corrosion upon its circumference; but this rust is not greater than is explainable by the action of the sea water on this voyage, particularly when combined with sugar, forming a sugar acid. The corrosion is, in fact, very much less than might have been caused in the same time by this acid infusion in a different situation, as shown by the case of The Alvena, 74 Fed. 252.

3. There is not sufficient evidence to warrant my finding that there was any lack of diligence in the inspection of the ship. The vessel was comparatively new, and built by first-class makers. She passed her first Lloyd's survey in February, 1895, when the whole bottom was inspected and the riveting found sound. No accident intervened. Diligent care of the ship does not require redocking more than once a year, in the absence of some known necessity for it; and at the time of this voyage, a year had not expired since the last docking.

4. The excessive vibration caused by long-continued racing in heavy weather is adequate to explain the breaking off of the countersink of the rivet. This has been known to occur before; usually with more than one rivet head broken off. Here there was but one broken. This, however, does not discredit the cause in this case, because there is otherwise abundant evidence of the existence of the cause in the long-continued very heavy weather, and much other damage to the ship. In the case of The Alvena there was no evidence of the existence of any sufficient external cause. 74 Fed. 252, 254, 255. But where the existence of an adequate cause of the damage to a seaworthy ship is proved, that is presumptively sufficient to relieve the ship. The Warren Adams, 20 C. C. A. 486, 74 Fed. 413, 416; The Sintram, 64 Fed. 884. Cases of single rivet heads broken off are in evidence. That only one was broken is evidence of the soundness of the general structure, or that the vibration was not sufficiently violent or long continued to break others. It is also likely enough that the cant given to the rivet by driving it through the overlapping holes which were not quite true, and the cant given to the clinch at both ends might diminish its endurance, by subjecting it to an unequal strain, and increasing the injurious effects of the vibration of the plates against it. If such was the fact, any such mere inequality in the strength of the rivets does not amount to unseaworthiness, or a violation of the provision of the charter that the ship shall be "tight, staunch and strong."

Upon the above conclusions of fact, it follows that the access of water through the rivet hole arose primarily from a peril of the sea; that is to say, it was an access of sea water through an accident to a seaworthy ship, arising from extraordinary weather, the conse-

quent racing of the engine, and the snapping off of one of the rivet heads. By the general exception of sea perils, the ship is consequently relieved from liability, unless it further appears from the evidence that the injury arising from the leak might have been avoided by reasonable diligence, or that some special provisions of the contract of carriage preclude any exemption of liability from such a cause.

The evidence leaves no doubt that had the sluicegate been opened twice daily, as customary, no damage would have happened, notwithstanding the leak. It is evident, however, that the daily opening of the sluiceways is a part of the "management of the ship": and inasmuch as the evidence shows that the owners and their agents exercised "due diligence," the ship and owners are exempted from liability for this resulting damage by the third section of the Harter act (Act Feb. 13, 1893; 2 Supp. Rev. St. 81, 82), unless the provisions of the Harter act are superseded by the contract, as the libelant claims. Hine v. Bermudez Co., 68 Fed. 920, 923. Although this act applies to shipments upon foreign vessels transporting cargoes to this country, I have no doubt that shipowners for whose benefit the exemptions of the third section were provided may waive these benefits and bind themselves to a more extended responsibility than the statute imposes, if they choose to do so; but no such waiver should be found, except upon explicit proof, or undoubted inference.

The charter party in this case, after reciting that the ship should be tight, staunch and strong, and in every way fitted for the voyage, provides for the delivery of cargo, but with numerous exceptions, which are stated in section 4, among which are the following:

"The act of God, perils, dangers and accidents of the sea or other waters of what nature and kind soever, * * * any latent defect in hull $_{or}^{and}$ machinery, stranding, collisions, and all other accidents of navigation, and all losses and damages caused thereby are excepted, even when occasioned by negligence, default or error in judgment of the pilot, master, mariners or other servants of the shipowner; but unless stranded, sunk or burnt, nothing herein contained shall exempt the shipowner from liability to pay for damage to cargo occasioned by bad stowage, by improper or insufficient dunnage or absence of customary ventilation, or by improper opening of the valves, sluices and ports, or by causes other than those above excepted, and all the above exceptions are conditional on the vessel being seaworthy when she sails on the voyage; but any latent defects in the hull, pipes or machinery shall not be considered unseaworthiness, provided the same do not result from want of due diligence of the owners or any of them, or by the ship's husband or manager."

The nineteenth clause of the charter provides that:

"The Mediterranean, Black Sea and Baltic grain cargo steamer bill of lading, 1885, is to be used under this charter, and its conditions are to form part thereof."

The bill of lading contains the clause, "All conditions as per charter party," giving the date of the charter, and then enumerates substantially the same exceptions as the charter; but as respects latent defects it reads that "latent defects in the machinery shall not be

considered unseaworthiness," etc.; whereas the charter reads, "latent defects in the hull <sup>and</sup><sub>or</sub> machinery," etc.

The shipment in the present case, however, was by the charterers; and the libelants, as indorsees of the bill of lading, took the goods subject to the provisions of the charter party, inasmuch as the bill of lading expressly recites, "All conditions as per charter party." The somewhat narrower provision of the bill of lading as respects the hull, therefore, does not exclude the additional provisions of the charter, and the provisions of the charter must, therefore, govern.

The effect of the charter exceptions is largely the same as the provisions of the Harter act—passed eight years after this form of bill of lading was adopted. By the language of the charter, a latent defect in the hull or machinery is not to be considered unseaworthiness, when, as I find here, there was no want of due diligence. If there was any defect in the rivet, it was a latent defect, as it was not visible upon such inspection as was required and given, as above found: so that the ship cannot be deemed unseaworthy under the charter. The Carib Prince, 15 C. C. A. 385, 68 Fed. 254.

The negligent failure to open the sluicegate in the heavy weather is clearly covered by the express exception of "perils, dangers, or accidents of the sea or other waters, * * * and all other accidents of navigation, and all losses and damages caused thereby, even when occasioned by negligence of the master, mariners or other servants of the shipowners."

In effect, this exception, as applied to this case, is identical with the third section of the Harter act, since the same negligence is a part of the "management of the ship." The Silvia, 64 Fed. 607, affirmed 15 C. C. A. 362, 68 Fed. 230; The Etona, 64 Fed. 880.

The subsequent provision of the charter, viz. that "nothing herein contained shall exempt the shipowner from liability to pay for damage to cargo occasioned * * * by causes other than those above excepted," does not aid the libelant, because the exception of sea perils and of negligence of the seamen in connection therewith is one of the "causes above excepted"; and it was that cause that made the leak operative to the libelant's damage.

The charter contains the further provision:

"That nothing herein contained shall exempt the shipowner from liability to pay for damage to cargo occasioned * * * by improper opening of valves, sluices and ports."

There can be no doubt that the opening of valves, sluices and ports during the voyage is a part of the "management of the ship." The Silvia, supra. Damage arising from negligence in this regard, therefore, would fall within the exemption of the Harter act; though this charter and the bill of lading provide that nothing therein shall exempt the owner from liability caused by improperly opening the valves, sluices or ports. The negligence in this case, however, does not fall within the language of this qualification. For this damage did not arise from any improper opening of the sluice-

gate, but from the neglect to open it at all during the heavy weather. The language of this adopted form of bill of lading, and the similar words of the charter, were a subject of such special deliberation, that I do not feel authorized to extend it to improperly keeping the valves, sluices and ports shut. The danger contemplated from the improper opening of valves, sluices and ports, was apparently of a different and much more serious kind, viz., the danger to the whole ship from being thus opened to the sea; making her liable to be quickly sunk, or to great general damage before the fault could be remedied. The probable ground of this particular exception, therefore, forbids its extension by construction to cases beyond its letter and its probable reason.

Even if the effect of this exception in cases coming within it, would be to supersede the provisions of the Harter act, and to make the ship and owner legally liable for the damage arising from open valves, etc., under their general liability for negligence, as to which I express no opinion, nevertheless, inasmuch as I cannot find this damage to be covered by this clause of the charter and bill of lading, the previous general exceptions, and the third section of the Harter act to the same effect are sufficient to absolve the ship.

The libel must be dismissed, with costs.