HUDSON RIVER LIGHTERAGE CO. v. WHEELER CONDENSER & ENGINEERING CO.

(District Court, E. D. New York. March 14, 1899.)

1. CARRIERS—CONSTRUCTION OF CONTRACT OF CARRIAGE.

A carrier under a contract for the carriage and delivery on a dock of heavy castings weighing several tons each constituting a part of machinery to be erected by the shipper is not bound to turn the castings over on delivering them, so as to leave them in position for placing together, in the absence of a special agreement to that effect.

2. SAME—INJURY TO GOODS IN SHIPMENT—PRESUMPTION OF NEGLIGENCE.

The fact that a casting was shipped in good order and was found cracked on delivery is presumptive evidence of negligence on the part of the carrier, and casts upon it the burden of proving in what manner the breakage occurred.

Peter S. Carter, for libelant.
Charles E. Lydecker, for respondent.

THOMAS, District Judge. This action is brought to recover for freight and demurrage, and the respondent seeks to offset injury to the cargo for the carriage of which said freight is alleged to have been earned and demurrage incurred.

In December, 1897, the respondent, having a large number of castings to be transported from Carterette or Jersey City, directly to Greenpoint, or in some cases to Mott Haven on the Harlem river, for finishing, and thence to Greenpoint, engaged therefor the libelant, through the latter's agent, one Schneider, who, as the representative of another carrier, had done similar work for the respondent. These castings were in three parts, known as tops, bottoms, and centers or

curbs. Each part weighed five or six tons, and their sum was about 200 tons. The carriage was made by the libelant on a barge rigged with a derrick; and the libelant's agent, in soliciting the business, stated to the respondent that it had all the facilities necessary for the proper handling of the freight. As has been stated, some of the castings were carried first from points in New Jersey to Mott Haven to be finished, and thence to Greenpoint for final delivery. Previous to the 11th day of May, the respondent had given notice to the carrier that certain parts at Mott Haven were ready for delivery at Greenpoint, and such parts could have been taken and delivered by the carrier at Greenpoint previous to the 11th day of May; and the respondent did not know that such carriage and delivery had not been made until the events arose which are the subject of this litigation. On the 11th day of May, 1898, the libelant's barge was at the dock at Greenpoint, with a lot of castings which it had taken on at Carterette, N. J.; and, while the barge lay at said dock ready for unloading, libelant advised the respondent that it would deliver the castings on the dock in the position in which each casting rested upon the deck of the vessel, but that it would not turn the castings over before delivering them upon the dock. It seems that the castings were intended for a sugar refinery, and that, unless they were delivered upon the dock in the relative positions in which they were to be placed in the refinery, it would be necessary for the respondent to rehandle them, and put them in such suitable position, before they could be used, and that he had no facilities upon the dock for handling matters of such weight and size, and that the company which its agent, Schneider, formerly represented, had been accustomed to so deliver them. It further appears that the libelant had turned, so far as was necessary, all previous pieces, but that some risk accompanied such turning, and that when the libelant discovered that its captain was turning the parts it forbade him doing so further, and advised the respondent that it would not turn such parts, giving as a reason for its refusal that such was no part of its duty as a carrier. This refusal led to some conversation between the parties; the libelant insisting that it was not its duty to turn the parts, and the respondent insisting that such was libelant's duty, and persisting in its demand that such duty should be performed. However, as the libelant continued in its refusal, the respondent, being urged by a penalty under which it rested for delay in setting the parts in the sugar refinery, according to its contention, agreed to take the risk of turning the parts, which were the bottom pieces of the plant; and representatives of each party went to the barge on the 12th day of May and watched the turning of the parts by the captain of the barge, who had sole control and direction thereof. All the parts were delivered safely upon the dock. On the 14th day of May, the load which had been taken to Mott Haven for finishing was brought to the dock at Greenpoint, and the captain of the barge proceeded to turn and to unload such parts; and, after they had been placed upon the dock, it was discovered that the flange of one of the upper parts was broken, and it was for such breakage that the respondent asks damages in this action. It is the contention of the respondent that at the time it made its agreement to assume the responsibility of unloading

the barge, which arrived on May 11th, it supposed that the pieces thereafter delivered from Mott Haven had been transported and delivered previously, and that its stipulation to assume the risk was confined entirely to the barge of the 11th, which it assumed to be the last lot to be delivered. The libelant claims, however, that the agreement was not so limited, but that it refused to take the risk of turning any pieces, and that the respondent, instead of agreeing to assume the risk of any particular load, assumed the risk of all the pieces that might be thereafter delivered. As a matter of fact, the respondent's foreman, who was present at the time of the delivery on the 11th, in company with the respondent's manager, was present during the entire unloading on the 14th, but states that he was not there for the purpose of superintending the unloading, but that he was at the refinery and on the dock for the purpose of superintending other work in which the respondent was engaged, and that, without any purpose or participation, he stood by and watched the unloading, and that he gave no direction, offered no suggestion, made no criticism, and did not know or even look to see whether there was any injury to the pieces until they were on the dock. It seems that one of the tops was placed on the ship with the broadest circumference down, and that it was necessary for the owner's convenience to turn it upon the ship and so deliver it on the dock. To do this, a stick was placed through a manhole between the two ends of the circular casting, and adjusted so that it was horizontal rather than vertical to the base; that a rope was tied to this, the casting raised, and, when sufficiently elevated from the deck, brought over onto its smaller end. Evidence is given on the part of the respondent which tends to show that the stick slipped around on account of being placed horizontally, as above stated, and slid up to the end of the opening,—a distance of about 12 inches,—which allowed the load to suddenly sag, bringing a great strain upon the casting, and that the casting also fell back and struck the deck, and that from such strain or striking, or both, the breakage, which was on the opposite side of the circumference from a point where the casting hit the deck, was caused. The libelant admits that there was some sagging of the rope, but claims that there was nothing more than was natural from the settling down of a heavy weight on the tackle, and contends that the casting was not broken at that time, but that, if it was, the same was caused by no negligence of the libelant, and that the shipper had assumed the risk.

The libelant, in addition to its claim for freight, asks for demurrage on the load arriving on the 11th, and which was not delivered until the 12th on account of the refusal of the carrier to turn it over as demanded by the respondent, and the consequent negotiation. The demurrage, it is said, began on the 11th day of May, at 6 p. m., and continued for 12 hours, at $10 an hour. The respondent does not base its demand for damages upon the strict rule which requires a carrier to assure the safe transportation and delivery of goods, but upon the negligence of the carrier.

Upon this evidence, the following conclusions are reached: (1) That it was no part of the carrier's duty to turn over the castings so as to have them in readiness for suitable placement by the owner after a

delivery on the dock. (2) The carrier was justified in believing from the conversation with the shipper on the 11th that the subsequent load of castings should be turned over at the risk of the owner, and the turning over was done pursuant to that understanding. (3) It does not appear, by a preponderance of evidence, that the fracture was caused by such turning, and as the burden of proof is on the libelant to show the cause of fracture, and as it claims that it was not done at that time, it is considered that it was not done in the course of such turning. (4) The fact that the casting was shipped in good order, and was found cracked upon delivery, is sufficient evidence of negligence, and thereby the carrier is called upon to give evidence of the cause of the fracture, which shall overcome the presumptive case thus raised against it. Phœnix Pot-Works v. Pittsburgh & L. E. R. Co., 139 Pa. St. 284, 20 Atl. 1058; Ketchum v. Express Co., 52 Mo. 390, 395, 396; Grieve v. Railroad Co. (Iowa) 74 N. W. 192, 193, and cases cited; Railroad Co. v. Sherwood, 132 Ind. 129, 135, 31 N. E. 781; Hinton v. Railroad Co. (Minn.) 75 N. W. 373; Hull v. Railway Co., 41 Minn. 510, 43 N. W. 391, following Shriver v. Railroad Co., 24 Minn. 506; and see Railway Co. v. Little, 12 Am. & Eng. R. Cas. 37; Rintoul v. Railroad Co., 16 Am. & Eng. R. Cas. 144; The Warren Adams, 20 C. C. A. 486, 74 Fed. 413, 414. The libelant has not given evidence tending to show sufficiently the cause of such fracture. Therefore it must be concluded that it was done in the course of transportation, and in the performance of duties imposed upon the carrier as such, and compensation should be made by the carrier. (5) No recovery for demurrage is allowed. (6) The libelant should recover freight, less the damages for breakage of cargo. Let a decree, pursuant to this decision, be entered, with costs according to the future direction of the court.