## THE AGGI.

(District Court, E. D. New York. April 7, 1899.)

1. SHIPPING—SEAWORTHINESS—INSPECTION.

The inspection required as to the seaworthiness of a vessel is anticipatory, and not alone for the discovery and correction of defects from which harm has arisen; and a system which contemplates a general overhauling and inspection of the vessel only every four years, and between such times only a general examination by the officers at the end of a voyage to ascertain whether there has been leakage, is inadequate to meet the requirements of the law.

2. SAME—INJURY TO CARGO FROM LEAKAGE.

A steamship had a wooden figurehead under her bowsprit, which was supported by scroll work extending back for several feet on each side of the vessel, to which it was secured by bolts passing through the sides, and fastened by nuts on the inside. This scroll work was subject to the action of the seas in heavy weather, especially when the ship was heavily laden; and such action had a tendency, at least, to loosen gradually the nuts on the bolts, if it did not necessarily do so when continued for any considerable time, and in such event the water could enter around the loosened bolts into the fore peak. The ship started on a voyage of several thousand miles, which would occupy some two months, and during which would occur the autumnal equinox. She was so heavily laden as to bring the scroll work within about nine feet of the water line. The fastenings of the scroll work had not been inspected for two years, and the only inspection made previous to entering upon the voyage was to ascertain that there had not been previous leakage. A consignment of sugar was stowed in the fore peak, which was injured during the voyage by water entering around the loosened bolts securing the scroll work. The ship encountered severe weather during the voyage, but no more so than was reasonably expectable. *Held*, that the facts were insufficient to sustain the burden resting on the owners to show due diligence to render the ship seaworthy at the inception of the voyage, under the requirements of the Harter act.

3. SAME—PERILS OF NAVIGATION—EVIDENCE OF SEAWORTHINESS.

Storms encountered during a voyage, although they may have been an adequate cause for an injury to the vessel resulting in leakage and damage to the cargo, are not sufficient to relieve the carrier from liability for such damage, nor from the burden of proving seaworthiness, where they were not of such an unusual character but that they should have been anticipated, and it is not shown that the injury could not have been provided against by proper inspection and care with respect to the part injured before sailing, and such inspection was not made, nor care exercised.

This was a libel by William Spaulding and others against the steamship Aggi to recover damages for an injury to cargo.

Carter & Ledyard and Walter F. Taylor, for libelants.
Convers & Kirlin and J. Parker Kirlin, for claimant.

THOMAS, District Judge. This action is to recover for injury to a cargo of sugar stowed in the fore peak of the steamship Aggi on a voyage from Java to Boston, begun in August, and ended in October, 1898. The fore peak is limited aft by the collision bulkhead, which extends, without opening, from the bottom of the vessel to the main deck. The vessel has the usual between deck and main deck, but 6 or 7 feet above the latter, and extending some 20 feet aft from the vessel's stem, is the forecastle head, beneath which are the crew's quarters, which are entered by a door on the main deck, and thence through a hatch in the main deck access is had to the fore peak. As the floors of the main and between decks do not fit snugly about the stem, there is an opening along the entire length of the same. Under the bowsprit of the vessel is a wooden figurehead, from which a sup-porting scroll work of wood extends back for 15 or 20 feet on each side of the vessel, to which it is secured by a single line of bolts, about a foot and a half apart, which pass through the wood and plating of the ship, and are fastened by nuts on the inside. The bolts are about five-eighths of an inch in diameter, and some of them are several inches long. The line of bolts is some 9 feet above the water line, with the ship loaded to a draft of about 23 feet, as she was, and from 1 to 2 feet above the main deck; and consequently the nuts securing them were in the forecastle, not immediately in the crew's quarters, but in a small closet opening into the same, and in the extreme bow, where they were concealed by coils of rope. At the end of the voyage, four, five, or six of these bolts nearest the bow were loosened so that a turn or so of the nut was needed to tighten them. This loos-ened condition permitted the water to enter and reach the main deck, whence it flowed into the hold through the described opening about the stem, and on the way injured the sugar, but specially damaged it by gathering in sufficient quantity in the bottom of the ship to reach the underside of the cargo. In the peak were athwartship floors, 2 feet apart, of plates standing on edge, and riveted to the frames at the side of the ship. They were something over 2 feet high at the after end of the peak, each successive one forward rising in height 6 or 8 inches, until in the extreme bow their greatest height was 5 or 6 feet. The floors were intersected by intercostal plates, extend-ing fore and aft, and thereby was constituted a series of pockets, from 2 to 6 feet deep, while on these floors dunnage, of the height of 2½ or 3 feet, was laid fore and aft. Hence the cargo was raised from the bottom of the ship the width or height of the dunnage plus the height of the floors. While all the other cargo spaces in the vessel were fitted with steam pumps, and hand pumps in reserve, only a hand pump was provided for the fore peak; and while the other cargo spaces were furnished with sounding wells, which would indicate even a few inches of water in the hold, the sounding well for the fore peak

would not indicate the presence of water until it had risen about 2 or 3 feet from the bottom of the vessel, although it appears that the place could be sounded by the pump. This sounding pipe was so exposed that it could not be used in rough weather, and for that reason was not used between Algiers and St. Johns. The pump was in order, and was apparently sufficient to empty the water entering through the loosened bolt spaces so that injury would not result to the cargo, and was of the kind in use at such place; a steam pump being undesirable, as it would necessitate a penetration of the collision bulkhead. The pump came down at the after end of the peak, and reached the lowest point thereof. As a matter of fact, the peak was not sounded by any process, save at one time, when the ship had proceeded about 1,500 to 1,800 miles on her voyage, and had been out from seven to nine days, during which time she had experienced on several days a "fresh breeze"; but whether this would cause the water to penetrate the bolt holes, if the bolts were loose, is entirely problematical. The evidence does not disclose the result.

The libelants advance several propositions: (1) That the fore peak was an improper place for stowing sugar, because the strain upon the parts about the bow was greater, and the probability of accident greater; (2) that the means of discovering the presence of water in the fore peak were not adequate; (3) that the presumption of seaworthiness does not obtain, and that the claimant has not sustained the burden of showing the same at the inception of the voyage.

It is considered that carriers are not precluded from utilizing the fore peak for the stowage of cargo similar to that here involved. But the fact of unusual exposure to leakage at that space, if such there be, rather bears upon the degree of diligence required of the carrier in securing it against the injurious action of the sea during the voyage. Therefore the first essential inquiry is this: Did the carrier use due diligence to make the vessel seaworthy before she undertook her voyage from Java? This inquiry is resolved into two subordinate questions: (1) As to the propriety of constructing a vessel with a figurehead fastened by bolts subject to loosen and admit water; (2) as to the diligence shown by the claimant in inspecting the vessel before her departure from Java. It appears that the vessel was of the highest class, and constructed under the supervision of the Lloyds and the Norwegian Veritas, and her figurehead was fastened according to the usual manner. For these reasons the court is disinclined to hold that such fastening was a fault in construction, although the suggestion arises readily that a piece of ornamentation subject to derangement from heavy seas, as was this, was not fitted and secured with abundant caution against expectable consequences.

Passing the question of construction, and coming to that of due maintenance, it appears that in March, 1896, the vessel received a general overhauling and inspection; and it is claimed that, in accordance with usage, such overhauling and inspection would not be repeated until 1900. Concerning the interval, it is urged that "it is not customary to go around the ship, and examine every bolt, rivet or fastening liable to become loosened in heavy weather, but that prudent officers would make a general examination of the ship, looking

to the places where the evidence of damage would naturally show," and, if the bolts "had been started prior to this voyage, they would have shown the same evidence of it that they did on this occasion; there would have been water below, which an ordinary examination of the ship would have discovered." The master testified that there had never been any damage to cargo in the fore peak; that he and other officers "had been down there plenty of times, looking around," and that "we have all considered the peak an exceptionally dry peak, compared to other ships; * * * we have had coals there in pretty rough weather, and when she was deeper loaded than on this voyage, and without appearance of water in the peak." This seems to have been the examination, inspection, care, and diligence to ascertain the continuing tightness of the nuts that held fast this line of bolts, from the construction of the ship to the time of injury. The claimant's theory of its duty seems to be founded on the expectation that, when the peak shall have leaked, the cause thereof shall be sought and corrected thereafter, with an additional overhauling at the end of each four years. The expert for the claimant states clearly this position, by saying that, if the ship comes in with a dry peak, it would be unnecessary to examine the bolts. The logical result of this contention is that a specific inspection of the bolts would be necessitated only by a wet peak (that is, after the damage the duty of activity in the examination of details arises); that when, by the presence of water in the peak at the end of the voyage, it should be indicated that the bolts had started, the moment for inspection of the bolts would have arrived. Such a governing rule for inspection is unhesitatingly condemned as inconsistent with the probable action of men of ordinary prudence. The inspection required of the carrier, as regards seaworthiness, is anticipatory, and not alone corrective of a defect from which harm has arisen. The diligence demanded by the Harter act precedes, and does not succeed, the injury. But what should the carrier in the case at bar have expected in the course of a voyage from Java to Boston, and with what precision should the minor attachments of the vessel have been examined? The vessel was deeply laden, and the voyage was several thousand miles in length, and would occupy some two months in performance; and within that time would be embraced the autumnal equinox. Mr. Martin, the expert called by the claimant, asserts that:

"If the vessel had very heavy weather for a period of two weeks, without substantial intermission, and was diving continually into the sea, this would be an adequate cause of loosening bolts, even if they were tight and in proper and seaworthy condition at the beginning of the voyage."

He further testified as follows:

"Q. Would it be a necessary cause? Must the result that you found necessarily flow from such a state of weather? A. Yes, sir; I think it must. Q. Therefore, if the shipowner, sending out a ship in that condition, knew that if she met with two weeks of heavy weather, wherein her bow would be constantly plunged into the water, there would be a loosening of those bolts and a necessary leakage? A. No: he might not know that. Q. He would know it just as well as you, wouldn't he? A. What I mean to say is this: If that vessel meets heavy weather, the seas are liable to loosen the scroll work."

The evidence of the witness leaves the court in some doubt as to whether he regards heavy weather as necessitating a loosening of the bolts, or whether it would be simply liable to do so. Taking the view most favorable to the carrier, it would be this: He would know (1) that the figurehead was fastened by means of bolts passing through the ship in such manner that, if loosened sufficiently, water would be allowed to pass through, and find its way along the stem to the cargo in the fore peak, and injure the same; (2) that the ship was going upon a long voyage at a time of the year when it might expect to meet with weather, liable to loosen the bolts and permit the damage above suggested. With this knowledge of the mechanical construction, and of the things expectable upon the journey, was it not his duty, before the ship started, to see that these bolts, which had not been overhauled or examined since 1896, were in a reasonably favorable condition to withstand the strain that would be brought upon them? Was it sufficient to rely upon the fact that there was no previous evidence of leakage in the fore peak from which he could infer a defective condition of the bolts, and did he have a right to rely upon this, and the overhauling which took place in 1896, and predicate thereon the absence of probable defect as regards these bolts? The ship was laden so deeply that even moderate weather would bring strain upon the bolts. Men of ordinary and reasonable prudence would know that weather of a severe nature would be met in the course of the voyage, and of the peculiar exposure of the figurehead to the buffeting of the waves, and would give particular care to the fastenings of such figurehead. As pointed out by the libelant's advocate, the mate testified:

"My experience as a sailor at sea would tell me that, if such a thing as a molding only three-quarters of an inch thick is washed against by a heavy sea,—constantly washed against by a heavy sea,—it can't stand the pressure."

And the claimant's expert, Mr. Martin, says:

"Any man who knows anything about a steamship knows that, if a ship meets with heavy weather, she is liable to loosen the scroll work on her bow."

And yet the care observed to discover whether over two years of voyaging had loosened the bolts was no greater than that above stated.

But this situation is met in a twofold way by counsel for the claimant:

(1) It is stated that when the vessel was 1,500 or 1,800 miles out of Java, and after she had been sailing from seven to nine days with a fresh breeze that should have exerted an influence upon the figurehead, the carpenter sounded the fore peak. It does not appear whether he discovered any water in the fore peak, although it may be inferred that he reported any excess of water; but, as he was unable to sound the fore peak within two or three feet of the bottom, it does not follow that there was no water present at the time.

(2) It is urged that the loosening of the bolts which allowed the water to enter the forepeak was caused by perils of the sea, of such an unusual nature that it could not have been reasonably expected by the claimant, and that, as they were adequate causes of the loosened bolts, the burden resting upon the owner to show seaworthiness is met. There is evidence of a consumption of 50 tons more coal than

was expected, in consequence of which the vessel put into St. Johns for an additional supply. The captain states that heavy weather was expected during these months, "but not so heavy as we had, nor so continually bad." And the log kept by the chief officer shows entries of stiff gales and high seas, and plenty of water on the deck; that she encountered gales of wind, with high seas. And there are records of a strong breeze, and large quantities of water; plenty of water on deck; heavy gales from the west; that the vessel was pitching heavily, and taking immense quantities of water on deck. And the mate characterizes the voyage as "a very rough voyage,—very stormy, rough voyage after we passed the Western Islands, at least." Now, it is argued that weather of this description, causing defects, necessitates the holding that the defect was caused by perils of the sea, and that, as such perils were sufficient to cause the leaks, it cannot be presumed that the ship was unseaworthy at the beginning of the voyage. However, it is not considered that the storms were so excessive in their nature as to constitute perils of the sea, within the exceptions in the bill of lading; nor were they of such an unexpectable nature that the carrier should not have anticipated them, in fulfilling the duty of providing a seaworthy vessel.

In The Colima, 82 Fed. 665, it appeared that the weather "did not amount to a gale until 8 a. m., but at 6 p. m. the master, in order to head the seas, had turned the ship two points off her course. The ship could not be kept head to the seas, and occasionally fell off into the trough of the sea, where she rolled heavily, and in three successive large waves was turned over completely, with nearly a total loss of ship, passengers, and crew." It was held that the storm was not phenomenal in character, nor more severe than every steamer should be prepared to meet, and that the ship should have been, but was not, sufficiently seaworthy to meet such a condition.

In the case of The Exe, 6 C. C. A. 410, 57 Fed. 399, the law was reiterated that a carrier by vessel could not escape liability for loss or injury of goods during transportation through dangers of navigation caused by his own previous default, notwithstanding the exception in the bill of lading from liability for sea perils, and that if the damage to the cargo, though immediately caused by danger of navigation, would not have been incurred if the steamship had been in a reasonably fit condition to resist the escape of water from the ballast tank into the hold, the libelant should not recover, notwithstanding the exempting clause. But it was held that there was no evidence tending to show any original fault in the construction, and that the stanchion which was found bent at the end of the voyage was in apparent good order at its beginning. And it is said in the opinion:

"Unless the strain or wrench was caused by some sudden or violent straining of the vessel on some of the occasions when she was plunging and rolling heavily, or by the pressure of the cargo, which yielded and surged with the surging of the ship, or by a combination of these conditions, the cause of it cannot be explained or even conjectured."

It is, indeed, stated that:

"The primary cause of the loss was the excepted cause,—the violent seas which set in motion the train of events that resulted in the entrance of the water into the hold, and the injury of the cargo."

If the weather encountered and described in the opinion be adopted as a standard for determining that the storms in the case at bar constitute sea perils, within the meaning of the exemptive clause, nevertheless the fact then present, and now absent, that the ship was seaworthy at the inception of the voyage, in regard to stanchion, lug, and bolt, afterwards found in a defective state, differentiates that case from the one now under consideration.

In The Edwin I. Morrison, 153 U. S. 199, 211, 14 Sup. Ct. 823, 827, it is said:

"We do not understand from the findings that the severity of the weather encountered by the Morrison was anything more than was to be expected upon a voyage such as this, down that coast, and in the winter season, or that she was subjected to any greater danger than a vessel so heavily loaded and with a hard cargo might have anticipated under the circumstances."

An examination of the thirteenth finding (page 205, 153 U. S., and page 826, 14 Sup. Ct.) in that case shows a condition of weather, and consequent results upon the ship, much exceeding, in degree of severity, anything indicated in the present case, and quite easily supports the conclusion here reached.

The argument of the claimant seems to be that, if the heavy weather would be an adequate cause for the leak, the burden of proving diligence to have the bolts in order before sailing has been met, although there be no evidence whatsoever that the bolts had been examined since 1896. The law is not so understood. The former obligation of a carrier was one of insurance of seaworthiness at the inception and during the voyage. This obligation has been lifted by the Harter act, provided it be shown that the owners used due diligence to make the ship seaworthy before she was sent out. The burden of proving this is on the owner. What diligence has he shown, either to discover whether the ship was seaworthy, or to correct any unseaworthiness discovered? Not the slightest fact is exhibited, save the overhauling some two years before, and that the captain and officers were down in the peak, and did not notice evidences of water. If, now, it be kept in mind that these nuts loosened gradually, as claimant's expert states, can the owner be said to have been diligent, who for two years has done nothing by way of inspecting the nuts because no leak had been observed, upon the apparent theory that there is time enough to look at the bolts that permit a leak, when the leak shall have occurred, and that the heavy seas encountered well enough account for their condition. Such a doctrine of caretaking cannot be sanctioned by this court, and is in direct antagonism to the expression of the supreme court in The Edwin I. Morrison, 153 U. S. 199, 215, 14 Sup. Ct. 823.

The following rules are fairly deducible from the decisions:

1. The requirement of "seaworthiness" intends that the ship shall be in a fit state, as to repair, equipment, crew, and in all other respects, to encounter the ordinary perils of the contemplated voyage. The Edwin I. Morrison, 153 U. S. 199, 211, 14 Sup. Ct. 823; The Titania, 19 Fed. 101, 105. But seaworthiness does not require perfection, but only reasonable fitness. Dupont de Nemours v. Vance, 19 How. 162, 167; The Rover, 33 Fed. 515, 521; Steel v. Steamship Co., 3 Mar. Law Cas. 516.

2. The burden of proving seaworthiness is upon the carrier. The Edwin I. Morrison, 153 U. S. 199, 211, 14 Sup. Ct. 823; The Warren Adams, 20 C. C. A. 486, 74 Fed. 413, 415; The Kensington, 88 Fed. 331; The Colima, 82 Fed. 665, 669; The British King, 89 Fed. 872, 873. And this burden requires that there shall be proof, not only of due inspection, but of actual repair, if repair be found necessary. The Edwin I. Morrison, 153 U. S. 199, 14 Sup. Ct. 823; The Alvena, 74 Fed. 252, 254, affirmed in 25 C. C. A. 261, 79 Fed. 973.

3. General evidence of seaworthiness may be sufficiently strong and satisfactory to show seaworthiness in the detail of construction which is the subject of the action. The Sandfield, 79 Fed. 371; Id., 61 U. S. App. 385, 92 Fed. 663; The Warren Adams, 20 C. C. A. 486, 74 Fed. 413, 415.

4. When a vessel, soon after leaving a port, becomes leaky, without stress of weather, or other adequate cause of injury, the presumption is that she was unseaworthy before setting sail. The Sandfield, 61 U. S. App. 385, 92 Fed. 663; The Warren Adams, 20 C. C. A. 486, 74 Fed. 413, 415; Pickup v. Insurance Co., 3 Q. B. Div. 594.

5. Where the loss is fully accounted for by sea perils (that is, where it is proven that sea perils caused the injury), the shipowner may not be called upon to show seaworthiness. The Sandfield, 79 Fed. 371, 375; The Kensington, 88 Fed. 331, 334, and the cases there cited and explained.

6. Where there was general proof of seaworthiness at the inception of the voyage, and an adequate cause is shown for the defect on the voyage, the burden of proving seaworthiness was deemed fulfilled. The Warren Adams, 20 C. C. A. 486, 74 Fed. 413, 415; The British King. 89 Fed. 872.

7. The fact that a vessel had been for a sufficient time subjected to conditions calculated to test her seaworthiness in the respect wherein she subsequently showed defect, without any evidences of such defect, and thereafter an adequate cause for the defect was present, is sufficient evidence that the ship was seaworthy at the beginning of her voyage. The Warren Adams, 20 C. C. A. 486, 74 Fed. 413, 416; Dupont de Nemours v. Vance, 19 How. 162, 168, 169.

It is considered that the claimant has not fulfilled the burden resting upon it to show seaworthiness, that it has not used due diligence in the matter of inspection, that its general evidence of seaworthiness is insufficient proof that the nuts and bolts covered by the coils of rope in the closet off the sailors' quarters were in order, that there is no evidence that the loosening of the bolts was caused so entirely by the storms on the voyage as to negative unseaworthiness at the inception of the voyage, and that the seaworthiness of the ship in regard to the bolts and nuts was not so tested and found to be satisfactory in the earlier stage of the voyage as to justify the finding that their final condition was ascribable wholly to the later prevailing storms. The difficulty is that the claimant used the fore peak for a cargo of sugar, knowing of the greater probability of strain upon that part of the ship, and the consequent greater exposure to leakage, and yet paid no attention to the bolts whatever, subsequent to the general overhauling more than two years before, save as the officers occasionally, when in

the peak, observed no leakage, and concluded that an opportunity therefor did not exist. It was evidently waiting for a leak before investigating the bolts as a cause thereof, and intended to wait another general overhauling in 1900 before doing so, unless a leak sooner discovered indicated the necessity of immediate examination. Carriers are not privileged, usually, to abstain for such time from detailed investigations of attachments which the expectable conditions of the journey may injuriously affect, and it is not apparent that a ship should be exempted from the ordinary requirements of prudent action applicable to the care of other vehicles of transportation. With what regard would courts receive the plea of a railway company that it had not examined bolts and nuts of a freight car for over two years, and did not intend to do so for two years more, unless some injurious effects from the bolts becoming loose should earlier appear; and this, too, while it knew that the bolts loosened by degrees, as the claimant's expert Martin testified was the case with those now under consideration, and also knew that such loosening would be likely to result from violent strains in the course of operation. Such a plea would merit and receive instant condemnation. Pursuant to the foregoing views, a decree is directed for the libelants, with costs.